No. 22-11341-F
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**
_____

The Professional Airline Flight Control Association,

*Plaintiff-Appellant*,

v.

Spirit Airlines, Inc.

*Defendant-Appellee*.

Appeal from the United States District Court for the Southern District
of Florida

No. 0:21-cv-60396-RKA
_____

**APPELLANT'S OPENING BRIEF**
_____

<div style="margin-left:40%">

D. Marcus Braswell, Jr. (146160)
Sugarman, Susskind, Braswell & Herrera
150 Alhambra Cir., Suite 725
Coral Gables, Fl. 33134
(305) 529-2801

*Attorneys for Appellant*
The Professional Airline Flight Control
Association

</div>

No.: 22-11341-F

Professional Airline Flight Association v. SAVE

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, Appellant hereby certifies that the following have an interest in the outcome of this appeal:

1.    Abreu, Ephraim David (Counsel for Appellee);

2.    Altman, Roy K (United States District Judge);

3.    Braswell, D. Marcus (Counsel for Appellant);

4.    Hall, Douglass W. (Counsel for Appellee);

5.    Jones Day (Counsel for Appellee);

6.    Professional Airline Flight Control Association - NKS (Appellant);

7.    Spirit Airlines, Inc. (SAVE) (Appellee);

FRAP 26.1 Disclosure Statement: No parent corporation or publicly held corporation owns 10% or more of any stock in Professional Airline Flight Control Association - NKS.

C-1 of 1

## <u>APPELLANT'S STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant believes that oral argument may be useful in light of the uncommon issues raised by this case, including the existence, as asserted in the district court's order (Doc 50 at 18) of retained rights under the Railway Labor Act.

# Table Of Contents

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement………….C-1

Statement Regarding Oral Argument……………………………………….........i

Table of Contents…………………………………………………………..........ii

Table of Citations…………………………………………….….............…....iv

Jurisdictional Statement…………………………………………………….…..vii

Statement of the Issues……………………………………………………..1

Statement of Case................................................................................................1

Statement of Standard of Review.......................................................................6

Summary of the Argument...................................................................................6

Argument...............................................................................................................9

    1.    The district court erred when it looked to the National Labor Relations Act to hold, contrary to applicable United States Supreme Court precedent, that employers under the RLA have a legally retained right to change employees' working conditions without complying with the procedures of Section 6 of the RLA, 45 U.S.C. §156, if the collective bargaining agreement does not expressly prohibit the employer from doing so ...............................................................................................9

        The district court looks erroneously to the National Labor Relations Act to hold that retained rights exist under the RLA..9

        The Supreme Court rulings in *Shore Line* and in *Pittsburgh & Lake Erie* exclude the existence of retained rights under the RLA.........................13

        The district court erred in distinguishing *Shore Line*......16

        The cases cited by the district court are distinguishable.........................20

2.      The district court erred when it made certain conflicting findings relating to the parties' collective bargaining agreement, and disregarded the plan language thereof in determining that the present dispute is not a "major" dispute under the RLA..................................24

Conclusion...........................................................................................................28

Certificate Of Compliance.................................................................................30

# Table of Citations

**Cases**                                                                                   **Page(s)**

*Airlines Pros. Ass'n, Teamster Loc. Union 1224 v. ABX Air, Inc.*,
   400 F3d. 411 (6th Cir. 2005) ........................................................ ........11

*Airline Pros. Ass'n of Int'l Bhd. of Teamsters, Loc. Union No. 1224, AFL-CIO v. ABX Air, Inc.*,
   274 F.3d 1023 (6th Cir. 2001) ...............................................................13

*Appalachian Regional Healthcare v. United Steelworkers of America*,
   245 F.3d 601 (6th Cir. 2001) ....................................................... .........13

*Association of Flight Attendants, AFL-CIO v. United Airlines, Inc.*,
   976 F.2d 102 (2nd Cir. 1992)........................................................ ........22

*Association of Flight Attendants v. Mesa Air Group, Inc.*,
   567 F.3d 1043 (9th Cir. 2009) ...................................................... ........21

*Bhd. Ry. Carmen of U.S. & Can., Div of Transp. Commc'ns Union v. Mo. Pac. R.R. Co.*,
   944 F.2d 1422 (8th Cir. 1991) ...................................................... ........21

*Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees*,
   481 U.S. 429 (1987)....................................................................... ........6

*Calderon v. Baker Concrete Constr., Inc.*,
   771 F.3d 807 (11th Cir. 2014) ...................................................... ........6

*Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*,
   491 U.S. 299 (1989).................................................................................7

*CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*,
   327 F.3d 1309 (11th Cir. 2003) ..................................................... .........6

*\*Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*,
   396 U.S. 142 (1969)..............................................................6, 8, 14, 17

*Div No. 1, Bhd of Locomotive Eng'rs v. Consol. Rail Corp.*,
   844 F2d 1218 (6th Cir. 1988) ...................................................... ........23

*Hilbert v. Pennsylvania R. Co.*,
   290 F2d 881 (7th Cir. 1961) ............................................................ ........23

*Norfolk and Portsmouth Belt Line R.R. Co. v. Bhd. of R.R. Trainmen, Lodge No. 514*,
   248 F.2d 34 (4th Cir. 1957)............................................................23, 24

*Order of Railroad Telegraphers v. Chicago & Northwestern Railway Co.*,
   362 U.S. 330 (1960).......................................................12, 14, 15, 16, 24

*Pittsburgh & Lake Erie R.R. Co. v. Ry. Lab. Execs.' Ass'n*,
   491 U.S. 490 (1989).......................................................11, 13, 17, 18, 20

*United Steelworkers of Am v. Warrior & Gulf Nav. Co.*,
   363 U.S. 574 (1960)...............................................................11, 12, 13

*United Transp. Union, Lodge No. 621 v. Illinois Terminal R. Co.*,
   471 F.2d. 375 (7th Cir. 1972) ........................................................ ........20

*United Transp. Union v. River Terminal Ry. Co.*,
   142 F.3d 438 (6th Cir. 1998)..............................................................20

**Statutes**

   28 U.S.C. §1291............................................................... ........1

   28 U.S.C. § 1291(1)..............................................................1

   28 U.S.C. §1331............................................................... ........1

   28 U.S.C. § 1337...............................................................1

   45 U.S.C. §151................................................................ ........1

   45 U.S.C. § 156...............................................................1

**Rules**

FRAP 26.1.................................................................................C-1

Fed. R. Civ. P. 12(b)(1)......................................................................2

11th Cir. R. 26.1-1 ...............................................................................C-1

**Other Authorities**

Oxford University Press. (n.d.) Retain. Oxford English Dictionary. Retrieved Mar. 25, 2002, from
https://www.oed.com/view/Entry/164150prskey=leRMYi&result=2#eid.....10

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Professional Airline Flight Control Association ("PAFCA") brought this action requesting equitable relief under the Railway Labor Act ("RLA"), 45 U.S.C. §151, *et seq.* Accordingly, the district court's jurisdiction over the matter was appropriate pursuant to 28 U.S.C. §§1331 and 1337. The Amended Complaint alleges that PAFCA is a labor organization and the exclusive bargaining representative, as defined by Section 1, Sixth the RLA, 45 U.S.C. §151 of the Flight Dispatch Officers in the employ of Defendant-Appellee Spirit Airlines, Inc. ("Spirit"). The Amended Complaint further alleges that Spirit is a common carrier by air engaged in interstate commerce within the meaning of the RLA. The district court entered a final Order on March 25, 2022 dismissing the Amended Complaint for lack of subject matter jurisdiction, thereby disposing of all claims by all parties. On April 22, 2022, PAFCA filed a timely notice of appeal. Jurisdiction in this Court is proper under 28 U.S.C. §§1291, 1294(1).

## STATEMENT OF ISSUES

I.    Did the district court err when it looked to the National Labor Relations Act to hold, contrary to applicable United States Supreme Court precedent, that employers under the RLA have a legally retained management right to change employees' working conditions without complying with the procedures of Section 6 of the RLA, 45 U.S.C. §156, if the collective bargaining agreement does not expressly prohibit the employer from doing so?

II.    Did the district court err when it made conflicting findings relating to the parties' collective bargaining agreement, and disregarded the plain language thereof in determining that the present dispute is not a "major" dispute under the RLA?

## STATEMENT OF CASE
### *Nature of Case*

Plaintiff-Appellant PAFCA brought this action alleging that Defendant-Appellee Spirit Airlines has violated the Railway Labor Act by attempting unilaterally, and without exhausting the bargaining and mediation procedures set forth in Section 6 of the Act, to divide Spirit's Flight Dispatch Officers into two separate groups by creating a new dispatch center in Orlando, Florida to which some of the Flight Dispatch Officers would be required to report.  All Flight Dispatch

1

Officers have for more than twenty years reported to a single dispatch office situated hours away from Orlando, in Miramar, Florida.

PAFCA asserts that this matter constitutes a "major dispute" under the RLA, and seeks permanent injunctive relief prohibiting Spirit to take any measures in furtherance of its desire to divide the Flight Dispatch Officers among two dispatch centers prior to exhausting the required procedures under Section 6 of the RLA.

*The Course of Proceedings and Dispositions in the Court below*

The original Complaint requesting injunctive relief under the RLA was filed on February 19, 2021.  On March 15, 2021, Spirit moved for dismissal of the Complaint under 12(b)(1) Fed. R. Civ. P.  PAFCA filed an Amended Complaint on March 29, 2021, and Spirit moved again to dismiss under 12(b)(1) on April 12, 2021. PAFCA filed its Response to the Motion to Dismiss the Amended Complaint on April 28, 2021.  Spirit filed a Reply on May 7, 2021. On March 25, 2022, the district court issued its Order dismissing the complaint, which PAFCA has appealed.[1]

*Statement of the Facts*

(References to the record are in the format [Docket entry number] at [Page number within Docket Entry])

Spirit is a major U.S. commercial airline based in Miramar, Florida, with

---

[1] Immediately following the erroneous Order, Spirit informed its employees of its intention to proceed with the unlawful division of the dispatch center without bargaining with PAFCA.

destinations in sixteen countries. *See* Kramer Decl. Doc. 12-1 at 1. Spirit's flight operations are supported by a staff of 75 Flight Dispatch Officers, who since February 21, 2018, have been represented for collective bargaining purposes by PAFCA. *See* Giarrocco Decl. Doc. 21-1 at 1-2. Prior to PAFCA, the Flight Dispatch Officers were represented by Transport Workers Union of America, which was certified in or about the year 2000. *See id.*at 1.

The terms and conditions of employment of the Flight Dispatch Officers that PAFCA represents are set forth in a collective bargaining agreement (the "Agreement") between PAFCA and Spirit, effective October 16, 2018 through October 15, 2023. *See* Giarrocco Decl. Doc. 21-1 at 1. Flight Dispatch Officers are highly trained individuals who must be FAA certified. *See id.* They exercise discretion over major flight decisions such as flight paths, fuel loads, alternate airports, and whether to dispatch a flight, delay a flight or cancel a flight. *See id*. at 1-2.

Throughout the bargaining relationship between the parties, all of the approximately seventy-five Flight Dispatch Officers whom Spirit employs, and whom PAFCA represents, are and at all times material hereto, have been, based in Spirit's dispatch office situated in Miramar, Florida, in the Miami metropolitan area. *See id.* at 2. Appellee's Flight Dispatch Officers have at all times worked in a single-office configuration. *See id*.

In or about February 2020, stating concerns regarding the occasional disruptive effects of hurricanes upon Spirit's dispatch functions, the carrier informed PAFCA that it intended to relocate the company's dispatch office to Nashville, Tennessee. *See id.* The parties had made specific provisions in the Agreement for the eventuality of a relocation of the dispatch office: In Section 6, Paragraph D, the parties agree, "Where the company opts to relocate the dispatch office to a new domicile more than fifty (50) AAA miles from its current location, the parties will meet to discuss and agree upon moving expenses for its affected employees." *See id.* In accordance with Section 6, Paragraph D, immediately following Spirit Airline's announced, intended relocation, the parties met to discuss moving expenses for Flight Dispatch Officers. *See id.*

Spirit Airlines later renounced its intended relocation, and in or about September 2020, informed PAFCA verbally, still upon the basis of hurricane disruptions, that it desired to operate simultaneously two dispatch offices by opening a second one in Orlando, Florida. *See id.* Informal bargaining soon ensued. *See id.*

Unlike the discussions that occurred under Section 6, Paragraph D of the Agreement following Appellee's announcement of its intended relocation, bargaining related to Spirit's desire to operate two dispatch offices occurred on a broader range of issues. Whereas Section 6, Paragraph D specifically provides for the relocation of the dispatch office, the Agreement is silent as to the creation of a

4

second dispatch office. *See id. at 3*. Spirit Airlines and PAFCA presented numerous written proposals on issues including bidding rights to work in one dispatch office or the other, cross-office seniority rights, cross-office shift trading, and other matters. *See id.* At present, the Agreement does not contain any provision relating to those matters, and that is because the parties never contemplated the existence of two dispatch office. *See id.*

In December 2020, the parties reached a tentative agreement relating to Spirit Airlines' desire to establish a second dispatch office, which tentative agreement the membership rejected. *See id.* at 5. The parties returned shortly thereafter to the bargaining table, and were close to reaching a ratifiable agreement. *See id.* Nonetheless, Spirit ceased negotiations and informed PAFCA that it intended to proceed unilaterally with the establishment of the second dispatch office and caused to be published through the press, its intentions to proceed. *See* Kramer Decl. Doc. 12-1 at 7. PAFCA believes that if Spirit had continued negotiations, the parties would have reached a ratifiable agreement, and this litigation would have been averted. *See* Giarrocco Decl. Doc. 21-1 at 5. PAFCA also believes that Spirit Airlines did not exercise every reasonable effort to reach an agreement. *See id.*

Not at any time during the informal bargaining sessions did Spirit Airlines state that it believed that any section of the parties' Agreement permitted Spirit to proceed unilaterally in furtherance of its desire to operate two dispatch offices. *See*

5

*id.* at 3. In one of the final informal bargaining sessions, the Company for the very first time stated that it believed that it had the right to create a second dispatch office unilaterally, because, in Spirit's opinion, the Agreement did not prohibit it. *See id.*

<div align="center">*Statement of the Standard of Review*</div>

Review of a district court's determination of its own subject-matter jurisdiction is *de novo. See Calderon v. Baker Concrete Constr., Inc.,* 771 F.3d 807, 810 (11th Cir. 2014). In addition, the district court's application of the RLA is reviewed *de novo. See CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.,* 327 F.3d 1309, 1320 (11th Cir. 2003) ("The district court's classification of a dispute as major or minor under the RLA is a question of law we review *de novo.*").  All issues stated herein are subject to de *novo review*.

<div align="center">

**SUMMARY OF ARGUMENT**

</div>

"The Railway Labor Act was passed in 1926 to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." *Detroit & T.S.L.R. Co. v. United Transp. Union*, 396 U.S. 142, 148 (1969) (*"Shore Line"*).  "Following decades of labor unrest that persistently revealed the shortcomings of every legislative attempt to address the problems, representatives of railroad labor and management created a system for dispute resolution that Congress enacted as the RLA in 1926." *Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429

<div align="center">6</div>

(1987). By amendments passed in 1936 the application of the Act was expanded to include commercial air carriers such as Appellee.

To achieve its purposes, Section 6 of the Act generally requires employers to exhaust extensive bargaining and mediation procedures prior to implementing any changes to the terms and conditions of employment of its employees. That Section provides:

> *Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice. In every case where such a notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either, or said Board has proffered its services, rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by Section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.*

The Act generally prohibits thus an employer to modify the status quo with respect to any rate of pay, any rule, or any working condition until the Act's dispute resolution procedures have been terminated.

In terminology coined by the courts, disputes under the Act are categorized as minor or major disputes. Minor disputes are disputes arising out of "the interpretation or application of agreements." *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 303 (1989). Such disputes do not involve a proposed change

to working conditions, and therefore are not subject to the bargaining and mediation procedures set forth in Section 6 of the Act; they are subject rather to compulsory arbitration in accordance with Section 3 of the Act.  Id.

Major disputes, on the other hand, involve the formation of collective bargaining agreement, "and efforts to change them." *Detroit & T.S.L.R. Co. v. United Transp. Union*, 396 U.S. 142, 148 (1969) (*Shore Line*).  Major disputes must be resolved through the bargaining and mediation procedures set forth in Section 6 of the Act, and the carrier is prohibited under that Section from changing the status quo until the procedures have been exhausted.

Even in a case involving a major dispute, a carrier might attempt to have the dispute characterized as minor by claiming that it involves the interpretation or application of a particular contract provision.  The referenced provision must, nonetheless, be shown to "arguably justify" the unilateral action that gave rise to the dispute, otherwise the dispute is major. *Consolidated Rail Corp. v. Railway Labor Executives Ass'n.*, 491 U.S. 299, 307 (1989).  "In a situation in which the party asserting a contractual basis for its claim is 'insincere' in so doing, or its 'position [is] founded upon ... insubstantial grounds,' the result of honoring that party's characterization would be to undercut 'the prohibitions of § 2, Seventh, and § 6 of the Act' against unilateral imposition of new contractual terms." Id. at 306.

This case involves an attempt to change an agreement, i.e., changing

8

employees' work location and changing from a single to dual office configuration, and constitutes therefore a major dispute under the RLA over which the Court has subject matter jurisdiction.

## ARGUMENT AND CITATIONS OF AUTHORITY

**1.    The district court erred when it looked to the National Labor Relations Act to hold, contrary to applicable United States Supreme Court precedent, that employers under the RLA have a legally retained management right to change employees' working conditions without complying with the procedures of Section 6 of the RLA, 45 U.S.C. §156, if the collective bargaining agreement does not expressly prohibit the employer from doing so.**

*The district court looks erroneously to the National Labor Relations Act to hold that retained rights exist under the RLA*

The district court held that employers have a retained management right under the RLA to change employees' working conditions without complying with the procedures of Section 6 of the Act, if a collective bargaining agreement does not expressly prohibit the employer from doing so.  The district court held that that legally existing right was, in turn, contractually preserved by Spirit under Section 18A of the parties' agreement.

That ruling and holding were in error.  Supreme Court precedent rejects the existence of legally retained management rights under the RLA, and therefore, such a right could not have been retained under Section 18A of the Agreement.

Section 18A, Management Rights, provides:

> **Except** as restricted by an express provision of this Agreement, the Company shall **retain** all rights to manage and operate its

9

> business and workforce, including but not limited to the right to
> sell or discontinue all or part of the business; to sell or lease
> aircraft or facilities; to determine where and when to operate
> scheduled or unscheduled flights; to determine its marketing
> methods and strategies and to enter into code sharing, affiliation
> or marketing agreements with other carriers; to invest (including
> equity investments) in other business entities including, without
> limitation, other air carriers; to determine the type of aircraft it
> will utilize; to increase and decrease its work force; to establish
> procedures; to determine qualifications for employment and
> promotions; to establish rules of conduct; to determine work
> schedules; to determine the means of providing passenger
> service; to determine size and composition of the workforce; to
> determine what equipment will be used; and to transfer
> operations or part of operations. (emphasis added).

Agreement, Doc 50 at 48. Giving the word "retain" its "ordinary meaning," the

district court found that Section 18A, provides for the retention, not the creation of

rights:

> And "retain" means to "to [*sic*] keep in custody or under control"
> or "[t]o continue to have or possess." *Retain*, OXFORD
> ENGLISH
> DICTIONARY,https://www.oed.com/view/Entry/164150prske
> y=leRMYi&result=2#eid (last visited Mar. 25, 2022). To
> *continue* to control or possess something presupposes that the
> subject *already* had the thing. The word's ordinary meaning,
> then, suggests what the caselaw has already told us–that Spirit
> *had* the right "to transfer operations or part of operations" and
> that it "continue[s] to have" that right… (emphasis in original).

Order, Doc 50 at 18. Since, as the court stated, "To continue to control or possess

something presupposes that the subject already had the thing," Section 18A is the

continuation of the rights enumerated therein and cannot also be the source of those

rights. *Id*.

10

The district court posited two legal sources for those rights: management prerogatives, and a class of rights that the district court termed, "retained rights." The district court proffered the following analysis of the two:

> In other words, PAFCA conflates two distinct concepts. The first is the concept of management prerogatives–such as selling or closing a business. These are the kinds of core entrepreneurial decisions an employer is never required to bargain over. *See Pittsburgh & Lake Erie R.R. Co. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 490, 509 (1989)…

> The second concept has to do with retained rights, which remain within management's discretion *unless* the collective bargaining agreement restricts them. Courts have widely held that, because a collective bargaining agreement "cannot expressly regulate every conceivable employment matter," those agreements "need not include provisions permitting management action on every conceivable employment matter; rather, on issues not discussed in the Agreement, management retains discretion." *Airlines Pros. Ass'n, Teamster Loc. Union 1224 v. ABX Air, Inc.*, 400 F3d. 411, 415-416 (6th Cir. 2005) (cleaned up). In the Supreme Court's words, 'Collective bargaining agreements regulate or restrict the exercise of management functions; they do not oust management from the performance of them. Management hires and fires, pays and promotes, supervises and plans. All these are part of its function, and absent a collective bargaining agreement, it may be exercised freely except as limited by public law and by the willingness of employees to work under the particular, unilaterally imposed conditions.' *United Steelworkers of Am v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 583 (1960)...

Order, Doc 50 at 17.

The existence of the first class of rights, management prerogatives, is undisputed. As the court noted, it is settled under the RLA that absent a restriction in the collective bargaining agreement to the contrary, a carrier generally holds a

11

management prerogative to sell all or any part of its business at any time. *See Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n*, 491 U.S. 490 (1980). Given that case law *creates* such a right, that prerogative ostensibly is *retained* in Section 18A of the Agreement.

The parties do not dispute that the Supreme Court's decision in *Order of Railroad Telegraphers v. Chicago & Northwestern Railway Co.* (*Telegraphers*) specifically rejects the existence of a management prerogative to change employees' work assignments as Spirit has done here. 362 U.S. 330 (1960). The district court similarly did not distinguish this action from the *Telegraphers* holding as to work assignments.

The question of law here, which the district court answered erroneously, is whether there exists an extra-contractual "retained right" permitting Spirit to change employees' work assignments unilaterally, if the collective bargaining agreement does not expressly prohibit it from doing so. The answer is no, and accordingly, Spirit could not "continue to have" any such right under Section 18A of the Agreement.

Although, in the passage of the Order cited above, the district court contends that courts have "widely" recognized the existence of "retained rights," the court cites only two cases: *ABX Air, Inc.* and *Warrior & Gulf Nav. Co.* (*See* Order, Doc 50 at 17-18). Regarding the concept of retained rights, both relate to the National

12

Labor Relations Act (NLRA), **not the Railway Labor Act**.

*Warrior & Gulf Nav. Co.* arose as a motion to compel arbitration under a collective bargaining agreement governed by the NLRA. 363 U.S. at 574.  That case makes no reference to the RLA.  While *ABX Air, Inc.* arose under the RLA, to support the proposition that management retains discretion over issues not discussed in the agreement, the case cites to an NLRA case. *See Airline Pros. Ass'n of Int'l Bhd. of Teamsters, Loc. Union No. 1224, AFL-CIO v. ABX Air, Inc.,* 274 F.3d 1023, 1029 (6th Cir. 2001) (citing *Appalachian Regional Healthcare v. United Steelworkers of America,* 245 F.3d 601, 604–05 (6th Cir.2001)).  In turn, *Appalachian Healthcare* cites directly to *Warrior & Gulf Nav. Co.* for the proposition, "...[O]n issues not discussed in the Agreement, management retains discretion." *Appalachian Regional Healthcare*, at 606) (citing *Warrior & Gulf Nav. Co., 363 U.S. 574 (1960)*).  *Warrior & Gulf Nav. Co.*, an NLRA dispute, is thus the sole source of the district court's holding that retained rights are "widely recognized." The term "retained rights," prior to the district court's ruling, was non-existent in RLA jurisprudence.[2]

*The Supreme Court rulings in Shore Line and in Pittsburgh & Lake Erie exclude the existence of retained rights under the RLA*

---

[2] The dissenting opinion in Pittsburgh & Lake Erie cautioned clearly against drawing parallels between the RLA and the NLRA: "...the Court relies on two later opinions declaring that 'an employer has the absolute right to terminate his entire business for any reason he pleases.'  But those opinions interpreted the strictures that the National Labor Relations Act places on an unregulated industry.  As we noted in First National Maintenance Corp., that is a situation far different from the RLA's governance of a regulated industry."

The U.S. Supreme Court has expressly rejected the notion of retained rights under the RLA.

In *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, (*Shore Line*), the Supreme Court explicitly ruled that carriers do not hold a retained right to do that which Spirit claims it has the right to do here: to change employee's work assignments in the absence of an explicit or implied contract provision prohibiting it from doing so. 396 U.S. 142 (1969). The Court had already in *Telegraphers*, which predated *Shore Line*, implicitly excluded, and rejected, the notion of retained rights. *See Telegraphers*, 362 U.S. 330 (1960).

In *Shore Line*, the railroad operated in part along a 50-mile stretch of track from Lang Yard in Toledo Ohio to Dearoad Yard near Detroit Michigan. *See Shore Line*, 396 U.S. at 143. For many years prior to the dispute, all train and engine crew reported each work day to, and clocked-out from, Lang Yard, the line's terminal. *See id*. at 143-44.

Subsequently, the railroad announced that it intended to establish a new outlying work station at Trenton, Michigan—approximately 35 miles north of Lang Yard--to which some employees would report directly at their own expense, rather than free of cost as they always had. *See id.* at 144. The union presented a Section 6 bargaining notice and the parties commenced proceedings under Section 6 of the Act. *See id.* at 144-45.

14

The railroad then announced that it was modifying its plan to create an outlying post in Trenton and would instead create two other outlying posts. *See id.* at 145. The union withdrew from the Section 6 proceedings and challenged the railroad's right to make the changes under the collective bargaining agreement before a special adjustment board under Section 3 of the RLA. *See id.* The adjustment board ruled that nothing in the parties' agreement prohibited the railroad from making the changes. *See id.* at 146. Following the decision of the adjustment board, the railroad reverted to its plan to establish an outlying post. *See id.*

The union again filed a Section 6 notice, and while the parties were in Section 6 proceedings, the railroad began unilaterally to implement the change. *See id.* The union threatened a strike, and the railroad petitioned the court to enjoin the union from striking. *See id.* The union counterclaimed to enjoin the railroad from creating outlying posts before Section 6 procedures had been exhausted. *See id.* at 146-47.

The railroad argued that since the collective bargaining agreement did not expressly prohibit the railroad from creating outlying posts, the creation of such posts was a work condition that was not covered by the status quo requirement in Section 6. *See id.* at 147-48. Accordingly, the railroad argued that it was entitled, even during the Section 6 procedures, to require employees to report to the new outlying post in Trenton. *See id.* at 148. The Court disagreed, and enjoined the carrier from implementing the change in the work assignments until the Section 6

15

procedures had been exhausted. *See id.* at 159.

In *Telegraphers*, due to declining traffic, railroad employees at several stations along the rail line became idle for the majority of their workday. 362 U.S. at 332. The railroad decided unilaterally to change the work assignments of certain employees by consolidating stations. *See id.* The collective bargaining agreement did not contain any provisions prohibiting the railroad from doing so. *See id.* The union served a Section 6 notice proposing a change to the collective bargaining agreement with regard to the consolidation. *See id.* The railroad refused to bargain, claiming that the decision to consolidate stations was a management prerogative. *See id.* at 332-33. The union responded by striking, and the railroad brought suit to enjoin the strike. *See id.* at 333. The Supreme Court rejected the company's position, finding that the dispute was major under the RLA. See i*d.* at 341-42. (finding, "But it is impossible to classify as a minor dispute this dispute relating to a major change, affecting jobs, in an existing collective bargaining agreement, rather than to mere infractions or interpretations of the provisions of that agreement.").

While *Telegraphers* is most notable for its holding that a carrier does not have a management prerogative to change work assignments, it is also significant in that all of the conditions were present for the Court to find the existence of a retained right, if such existed. Neither the carrier nor the Court proffered or found such a right.

16

*The district court erred in distinguishing Shore Line*

The district court sought to distinguish *Shore Line* and *Telegraphers*:

*But those cases are completely irrelevant here. While both discuss what should happen in the event of a major dispute, neither helps us answer the question we face today: What constitutes a major dispute in the first instance?*

Order; Doc 50 at 12. With regard to *Shore Line* in particular, the district court elaborates:

> The only issue before the Court appears in the first sentence of its opinion: "This case raises a question concerning the extent to which the [RLA] imposes an obligation upon the parties to a railroad labor dispute to maintain the status quo while the purposely long and drawn out procedures of the Act are exhausted"…
>
> In our case, though, we don't *get* to the big question the Court addressed in Shore Line–the scope of any status-quo injunction– **because (contra *Shore Line*) we have no Section 6 proposal to amend the CBA.**

Order, Doc 50 at 12-13 (emphasis added). In its attempt to distinguish *Telegraphers* and *Shore Line* on those bases, the district court failed to address the Supreme Court's decision in *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n*.

In *Pittsburgh & Lake Erie*, the Court was presented with the question of whether a carrier's decision to go out of business was a "working condition" about which the carrier was required to bargain and maintain the status quo under *Shore Line*. 491 U.S. at 490. In holding that the decision to cease business is a management prerogative that falls outside of the scope of Section 6, the Court made

17

clear the import of *Shore Line* with regard to decisions that are not management prerogatives, stating:

> Section 156 deals with bargaining and settlement procedures with respect to changes in *agreements* affecting rates of pay, rules, or working conditions. There must be notice of such intended changes, as well as bargaining and mediation if requested or proffered. And in every case involving *such* notice, *i.e.,* of intended changes in *agreements,* rates of pay, rules or working conditions shall not be changed by the carrier until the specified procedures are satisfied. ***Because § 156 concerns changes in agreements, it is surely arguable that it is open to a construction that would not require the status quo with respect to working conditions that have never been the subject of an agreement, expressed or implied, and that, if no notice of changes had been served by the union, could be changed by the carrier without any bargaining whatsoever. Shore Line rejected that construction***, but as indicated in the text, we are not inclined to apply *Shore Line* to the decision of P & LE to go out of business.

*Id.* at 506 n.15.  Contrary to the position taken by the district court here, *Pittsburgh & Lake Erie* instructs that the holding in *Shore Line* is not limited only to the breadth of the status quo requirement in disputes where Section 6 has been invoked. *Pittsburgh & Lake Erie* also brings within the scope of the bargaining and status quo requirements changes in work conditions not addressed in the agreement, regardless of whether the union has filed a Section 6 notice.  *See id.*

Contrary to the district court's ruling*, Shore Line*, as explained by the Court in *Pittsburgh & Lake Erie*, goes a long way to help us "answer the question we face today: What constitutes a major dispute in the first instance." *See* Order, Doc 50 at 12.  The decision clearly excludes the existence of "retained rights," as that term

was defined and applied by the district court. Under *Pittsburgh & Lake Erie*, the distinction that the district court drew between this case and *Shore Line*, erodes. It is of no significance that Section 6 notices had been served in *Shore Line*, but not here.

It also is of no importance that the carrier in *Shore Line* was challenging the status quo requirements, as opposed to PAFCA challenging Spirit's requirement to bargain, in the absence of a provision expressly prohibiting it from changing work assignments. *Shore Line,* as explained by *Pittsburgh & Lake Erie*, renders those distinctions immaterial.

*Shore Line* and this case are indeed indistinguishable in all material respects. As the railroad did in *Shore Line*, Spirit sought to modify unilaterally, employees' work assignments. To justify such action, Spirit cites to the absence of an explicit or implied provision in the bargaining agreement prohibiting it from doing so.

As in *Shore Line,* the dispute here relates to the employer's unilateral decision to operate a second work center simultaneously with the work center already established. Some employees would be expected to report directly to such second work center, thus disturbing the settled practice of reporting daily to a single work center. Here, on the occasions of threatening storms, the practice, as set forth in the Agreement, has been for Appellee to transport a hurricane response team to a temporary site away from the storm. Agreement, Doc 10-1 at 38. *Shore Line*, like

19

Spirit here, argued that since the collective bargaining agreement did not contain an express prohibition against the operation of a second work site, it was within its right to do so.

The Court in *Shore Line* rejected that argument.  The district court's holding here amounts effectively to an overturning of *Shore Line*.

*The cases cited by the district court do not address Pittsburgh & Lake Erie and are distinguishable*

The district court contends, "As it turns out, federal courts have universally" rebuffed parties' efforts to contort *Shore Line*'s reasoning in the way PAFCA does here." Order, Doc 50 at 13.  The court's contention is simply mistaken.

The Supreme Court in footnote 15 of *Pittsburgh & Lake Erie*, gave *Shore Line* the same reading that PAFCA presented in the proceedings below.  *Pittsburgh & Lake Erie*, 491 U.S. at 506, n.15.  The Seventh Circuit also has stated explicitly that "the *Shore Line* decision includes the implicit finding that a major dispute existed." *United Transp. Union, Lodge No. 621 v. Illinois Terminal R. Co.,* 471 F.2d. 375, 380 (7th Cir. 1972).

In support of the erroneous contention, the district court cites three non-binding cases.  Inasmuch as those cases fail to address *Pittsburgh & Lake Erie*, they are not persuasive.

Furthermore, the cases cited by the district court are readily distinguishable. First, the district court cites the Sixth Circuit's unpublished opinion in *United*

20

*Transp. Union v. River Terminal Ry. Co.,* 142 F.3d 438 (6th Cir. 1998) (*See* Order, Doc 50 at 13). That case, however, related to the employer's unilateral attempt to correct a seniority list that both the employer and union acknowledged was erroneous. The court in *River Terminal Ry. Co.* did not address the question of whether a carrier may change employees' work assignments in the absence of a provision in the bargaining agreement permitting it to do so.

The district court next cited *Association of Flight Attendants v. Mesa Air Group, Inc.,* 567 F.3d 1043 (9th Cir. 2009). *(See* Order, Doc 50 at 13.*).* That dispute involved the scheduling of flight attendance. The court in *Mesa Air Group, Inc.* distinguished *Shore Line* on the ground that unlike *Shore Line*, the Mesa Air CBA contained a specific provision relating precisely to the scheduling question at issue. *See id.* at 1048. In the present case, the district court has framed the issue in terms of management's discretion *in the absence of* a specifically controlling provision.

The third case cited by the district court is *Bhd. Ry. Carmen of U.S. & Can., Div. of Transp. Commc'ns Union v. Mo. Pac. R.R. Co* , 944 F.2d 1422 (8th Cir. 1991). (*See* Order, Doc 50 at 13). That case dealt with the railroads' right to lease tracks to third parties in order to enable maintenance to be performed by employees of the third-party, who were not covered under the collective bargaining agreement with the union. The court, in holding that the dispute was minor, distinguished *Shore Line* explicitly on the ground that, unlike in *Shore Line* the railroads in Carmen had

asserted a past practice of leasing tracks. *See id*. at 1427, n.5.

In the present case, Spirit has not asserted any past practice of changing employees' assignments from single to dual dispatch offices. Since the cases cited by the district court do not address *Pittsburgh & Lake Erie's* explanation of *Shore Line,* and are neither controlling, nor factually similar, this Court should decline to follow those cases.

The district court also cited four non-binding decisions in support of the proposition that "federal courts across the country have agreed that an airline's attempt to relocate its operations constitutes a minor dispute." *See* Order, Doc 50 at 10. However, this case does not present a *relocation* of Spirit's operations—a term to which the parties expressly and carefully ascribed a particular meaning in the collectively bargaining agreement and that is not implicated by the facts of this case. Even so, the cases cited by the district court are clearly distinguishable.

The first case cited by the district court is *Association of Flight Attendants, AFL-CIO v. United Airlines, Inc.* (*United Airlines*), 976 F.2d 102 (2nd Cir. 1992) (*United Airlines*) (*See* Order, Doc 50 at 10). That case dealt with the carrier's failure to request a sufficient number of visas to staff its new hub in Paris and the consequent hiring of local labor to fill vacancies. The union acknowledged that there were contract provisions that on their face arguably justified the carrier's actions, but urged that the company had exercised those provisions in bad faith, thus rendering

the dispute minor. *Id., at 105.* In the present case, PAFCA refutes the existence of any arguably justifying provision in the Agreement.

The second case cited by the district court is *Div. No. 1, Bhd. of Locomotive Eng'rs. v. Consol. Rail Corp.* 844 F2d 1218 (6th Cir. 1988) (*See* Order, Doc 50 at 11). That case involved a dispute regarding seemingly conflicting language in several side agreements relating to the station at which the carrier's employees would report to work. *See id.* at 1221. In the present case, there is no issue as to conflicting language in the agreements.

Next, the district court cites *Hilbert v. Pennsylvania R. Co.*, 290 F.2d 881 (7th Cir. 1961) (*Hilbert*) (*See* Order, Doc 50 at 11), a pre-*Shore Line* case. *Hilbert* addressed a claim by the carrier that changes to the reporting station had been made unilaterally in the past. *See id.* at 883. *Hilbert* also involved the resolution of conflicting language between the collective bargaining agreement and a side regulation which the union argued prohibited such changes. *See id* at 885. In the present case, there is neither a question of conflicting language, nor a claim by Spirit that it unilaterally divided the dispatch center in the past thus creating an implied provision of the Agreement. The district court held here that the changing of work assignments is a right which remains "within management's discretion *unless* the collective bargaining agreement restricts them. *See* Order, Doc 50 at 17. The court in *Hilbert* never purported to address that question.

Finally, the district court cites *Norfolk and Portsmouth Belt Line R.R. Co. v. Bhd. of R.R. Trainmen, Lodge No. 514*., 248 F.2d 34 (4th Cir. 1957) (*See* Order, Doc 50 at 11). In *Norfolk*, a pre-*Telegraphers* decision, the railroad took the position that the railroad "'in the exercise of its managerial prerogative, and without regard to the wishes of the Brotherhoods, has the inherent right as management to change the designated point of reporting and relief.'" *Norfolk and Portsmouth Belt Line R.R. Co. v. Bhd. of R.R. Trainmen, Lodge No. 514,* Id., at 43. During the proceedings, the union agreed that the rail road had the right to make the decision, and sought bargaining only as to the effects. Id. Of course, the Court in *Telegraphers* rejected just a few years later, the existence of a management prerogative to change employees' work assignments. *See Telegraphers*, 362 U.S. at 342.

Since no retained right exists under the RLA that permits Spirit to make the change in working conditions that it has unilaterally undertaken here, no such right could have been contractually retained in Section 18A of the Agreement. Accordingly, as discussed below, the district court erred in finding that Section 18A arguably justified Spirits' changing of work conditions.

## 2.     The district court erred when it made conflicting findings relating to the parties' collective bargaining agreement, and disregarded the plain language thereof in determining that the present dispute is not a "major" dispute under the RLA.

As discussed above, the district court found that Section 18A of the collective bargaining agreement serves as a retention of rights, not a source. To retain

something "presupposes that the subject *already* had the thing." Order, Doc 50 at 18.

Separately, however, in ruling that the collective bargaining agreement arguably justifies Spirit's actions, the court drew predominately from Section 18A:

> Spirit easily meets Conrail's "arguably justified" standard. Indeed, the CBA has a *sweeping* management-rights clause that expressly says: "Except as restricted by an express provision" in the CBA, Spirit "retain[s] all rights to manage and operate its business and workforce." CBA §18A. It seems fair to conclude that Spirit's right to "manage and operate its business and workforce" includes *both* the right to expand its facilities *and* the right to determine where its employees should work. And, fortunately we don't need to guess at this inference because, in setting out a non-exhaustive roster of "retained" rights, the CBA explicitly lists–in no uncertain terms–Spirit's right to "*transfer operations or part of operations.*" **This provision is, standing alone, probably enough for Spirit to satisfy** *Conrail's* **relatively low bar**…   (emphasis in district court Order).

Order, Doc 50 at 9. Since, as discussed above, the RLA does not give Spirit a *legally* retained management right to change employees' work assignments if the collective bargaining agreement does not prohibit it from doing so, no such right could have been contractually retained under Section 18A. The court's two findings are irreconcilable, and on that ground alone, the case should be at the very least remanded to the district court.

As the district court stated, the finding that Section 18A serves as a retention of rights gives the words in that Section their "ordinary" meaning. *See* Order, Doc 50 at 18. Any right which Spirit might contend was arguably retained, and thus

arguably justified by Section 18A, must therefore have its source outside of Section 18A, whether that be in well-established case law or in a specific contractual provision.

The district court found erroneously that Section 6D of the Agreement arguably justifies Spirit's actions:

> But there's (much) more. Other provisions of the CBA likewise appear to recognize Spirit's right to transfer its operations. So, for example, one section (on moving expenses) provides that, "[w]here the Company *opts* to relocate the dispatch office to a new domicile…, the parties will meet to discuss and agree upon moving expenses for affected employees."

Order, Doc 50 at 9. (emphasis in Order) (paraphrasing Section 6D of the Agreement). The full text of 6D reads, however:

> Where the Company opts to relocate the dispatch office to a new domicile **more than fifty (50) AAA miles from its current location**, the parties will meet to discuss and agree upon moving expenses for affected employees. (emphasis added).

Agreement, Doc 10-1 at 19. The language in bold type is omitted from the district court's citation. The Opinion disregards undeniably the explicit definition that the parties gave to "relocation." The effect is that the provision is made to say something that it literally does not say.

Clearly, the essence of the provision is the act of moving *the* dispatch center more than fifty miles from its current location, and it is undisputed that Spirit does not plan to relocate the current dispatch center at all. Furthermore, throughout the

entire Agreement, the parties refer exclusively and invariably to "the" dispatch center in the singular. *See* Agreement, Doc 10-1. No reference is found therein to multiple, or to the possibility of multiple, dispatch centers. Amidst those several considerations, for the district court to seize upon the words "affected employees" to suggest that the provision encompasses more than that which the parties carefully and expressly defined as a relocation of **the** center (there is no mention of **part** of the center), exceeds the facial examination to which courts are limited in determining an "arguable justification." *See* Order, Doc 50 at 9. It exceeds the act of interpretation and is akin to a reformation. Not even Spirit, whose burden it is to show an arguable justification, proffered that understanding of the provision.

The district court further states, "The CBA also says that "orders" involving "transfers" or "relocation" must be in writing, suggesting (it would seem) that Spirit has the *authority[3]* to order its employees to relocate." *See* Order, Doc 50 at 8-9 (emphasis in Opinion). PAFCA has never disputed that Spirit has the authority to order a relocation of the dispatch center, as that term is clearly defined by the parties in section 6D. Indeed, as set forth in the declarations of Susan Kramer and Alex Giarrocco (see, statement of facts), once Spirit announced its initial plan to relocate (in this instance, the term is as agreed) the dispatch center to Nashville, Tennessee,

---

[3] It is worth noting, as well, that the term "transfers" in the agreement is used exclusively to refer to transfers of an employee from one employment title to another.

the parties met and bargained, as provided in the Agreement.

Finally, the district court states, "PAFCA's problem, however, is that it's simply *not our role* 'to consider the merits of the underlying dispute–to determine, in other words, whether the CBA does (or does not) allow Spirit to transfer part of its operations to Orlando." Order, Doc 50 at 10. Nowhere in the complaint has PAFCA requested that the district court reach the merits of what the CBA allows.

In the clear absence of any provision in the Agreement that arguably justifies Spirit's actions, PAFCA requests respectfully that the court exercise its role as protector of the procedures set forth in Section 6 of the RLA, to require Spirit to exhaust those procedures before resorting to the self-help measures that it has thus far pursued. PAFCA's position is and has always been that the conflict and its results be left to the bargaining process.

## CONCLUSION

The district court err when it looked to the National Labor Relations Act to hold, contrary to applicable United States Supreme Court precedent, that employers under the RLA have a legally retained management right to change employees' working conditions without complying with the procedures of Section 6 of the RLA, 45 U.S.C. §156, if the collective bargaining agreement does not expressly prohibit the employer from doing so. It also erred when it made conflicting findings relating to the parties' collective bargaining agreement, and disregarded the plain language

28

thereof in determining that the present dispute is not a "major" dispute under the RLA.

For the foregoing reasons Plaintiff-Appellant PAFCA requests that this Court reverse the Order of March 25, 2022, and direct the entry of Order enjoining Defendant-Appellee Spirit from implementing changes to employees' designated site of work prior to exhausting the procedures set forth in Section 6 of the Act.  In the alternative, PAFCA requests that this case be remanded to the district court for further proceedings consistent with the Supreme Court's ruling in *Shore Line*.

**Date:**  June 6, 2022          Respectfully submitted,


   /s/ D. Marcus Braswell, Jr.____

**D. Marcus Braswell, Jr. (146160)**
**mbraswell@sugarmansusskind.com**
**SUGARMAN, SUSSKIND, BRASWELL &**
**HERRERA, P.A.**
150 Alhambra Cir., Suite 725
Coral Gables, FL  33134
Tel. (305) 529-2801
Fax. (305) 447-8115

**Attorneys for Plaintiff-Appellant PAFCA**

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7347 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Office 16 in Times New Roman 14 Point.


(s)  D. MARCUS BRASWELL
Attorney for Plaintiff-Appellant
Professional Airline Flight Control Association

30