**No. 22-11341-F**

_____

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

PROFESSIONAL AIRLINE FLIGHT CONTROL ASSOCIATION,

*Plaintiff-Appellant,*

v.

SPIRIT AIRLINES, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Florida,
No. 0:21-cv-60396-RKA

_____

**APPELLEE'S ANSWER BRIEF**

_____

Douglas W. Hall
JONES DAY
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-5432
dwhall@jonesday.com

Ten E. Stallings
JONES DAY
600 Brickell Avenue, Suite 3400
Miami, FL 33131
(305) 714-9757
tstallings@jonesday.com

*Counsel for Defendant-Appellee Spirit Airlines, Inc.*

No. 22-11341-F

*Professional Airline Flight Control Ass'n v. Spirit Airlines, Inc.*

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT (CIP)**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, 1-2, and 1-3, Appellee Spirit Airlines, Inc., provides the following Certificate of Interested Persons and Corporate Disclosure Statement:

1. Altman, Hon. Roy K. – United States District Judge for the Southern District of Florida.

2. Braswell, Jr., D. Marcus – Counsel for Appellant.

3. Hall, Douglas W. of Jones Day – Counsel for Appellee.

4. Hunt, Hon. Patrick M. – United States Magistrate Judge for the Southern District of Florida.

5. Jones Day – Counsel for Appellee.

6. Professional Airline Flight Control Association – Appellant.

7. Spirit Airlines, Inc. – Appellee.

8. Spirit Finance Cayman 1 Ltd. – a wholly-owned subsidiary of Spirit Airlines, Inc. (other than a special share issued to a special shareholder, who granted a proxy to vote such share to a collateral agent for 8% senior secured notes).

C-1

9. Spirit Finance Cayman 2 Ltd. – a wholly-owned subsidiary of Spirit Finance Cayman 1 Ltd. (other than a special share issued to a special shareholder, who granted a proxy to vote such share to a collateral agent for 8% senior secured notes).

10. Spirit IP Cayman Ltd. – a wholly-owned subsidiary of Spirit Finance Cayman 2 Ltd. (other than a special share issued to a special shareholder, who granted a proxy to vote such share to a collateral agent for 8% senior secured notes).

11. Spirit Loyalty Cayman Ltd. – a wholly-owned subsidiary of Spirit Finance Cayman 2 Ltd. (other than a special share issued to a special shareholder, who granted a proxy to vote such share to a collateral agent for 8% senior secured notes).

12. Stallings, Ten E. of Jones Day – Counsel for Appellee.

13. Sugarman & Susskind, P.A. – Counsel for Appellant.

Except as disclosed above, no other persons, associations of persons, firms, partnerships, or corporations are known to have an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Spirit Airlines, Inc. does not believe that oral argument is necessary in this case. This matter involves a run-of-the-mill "major/minor" dispute under the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.* As Spirit can show that its decision to open a second Operations Control Center is "arguably justified" by its collective bargaining agreement with Appellant Professional Airline Flight Control Association ("PAFCA"), the dispute is minor and thus outside the jurisdiction of the federal courts. *See Consolidated Rail Corp. v. RLEA*, 491 U.S. 299 (1989) ("*Conrail*"). The *Conrail* standard is heavily tilted in finding disputes to be minor, and this Court may make its determination based on the arguments and record citations in the parties' briefs without the need for oral argument.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP) .................................................. 1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF CONTENTS ................................................................................... ii

JURISDICTIONAL STATEMENT ..................................................................... 1

STATEMENT OF THE ISSUE ........................................................................... 1

STATEMENT OF THE CASE ............................................................................ 1

    Statement of Facts ...................................................................................... 1

    Course of Proceedings and Disposition Below .......................................... 3

STANDARD OF REVIEW ................................................................................. 7

SUMMARY OF THE ARGUMENT .................................................................... 8

ARGUMENT ................................................................................................. 12

    I.    *CONRAIL* AND ITS PROGENY CONTROL THE ANALYSIS OF WHETHER a DISPUTE IS MAJOR OR MINOR ............................................................................... 12

        A.    Under *Conrail*, A Dispute is Minor Unless the Carrier's Position is "Frivolous" or "Obviously Insubstantial." ............................................................ 13

        B.    PAFCA Misrepresents The Holding of *Conrail*. ............... 15

        C.    Management Rights Clauses Can Serve As The Basis For Finding A Dispute Minor. ........................................... 18

        D.    *Shore Line* And *Telegraphers* Do Not Establish The Standard To Be Applied In Determining Whether A Dispute Is Major Or Minor ................................................. 24

    II.    SPIRIT EASILY SATISFIES THE *CONRAIL* STANDARD, AND THUS THE PARTIES' DISPUTE OVER THE OPENING OF A SECOND OCC IS MINOR ............................................................................... 29

        A.    The CBA's Management Rights Clause, Standing Alone, Arguably Justifies Spirit's Position .......................... 29

        B.    Other CBA Provisions Likewise Support The Conclusion That The Dispute Is Minor. ........................... 31

III.   PAFCA'S REMAINING ARGUMENTS LIKEWISE
       CONFIRM THAT THE PARTIES' DISPUTE TURNS
       ON INTERPRETATION OF THE CBA, AND THUS IS
       A MINOR DISPUTE. .................................................................. 33

       A.    PAFCA and Spirit Have Competing Interpretations
             Of The Scope Of The Rights Retained By Spirit In
             Section 18.A. .......................................................... 34

       B.    PAFCA Wrongly Accuses The District Court Of
             Creating New Law In Finding The Concept Of
             Retained Rights Applicable In The RLA Context............ 37

       C.    Neither *Shore Line* Nor *Telegraphers* Establish A Rule
             Excluding The Existence Of Retained Rights Under
             The RLA. ............................................................... 42

CONCLUSION ........................................................................ 46

CERTIFICATE OF COMPLIANCE .......................................... 47

CERTIFICATE OF SERVICE .................................................. 48

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*AFA v. Horizon Air Indus., Inc.,*
    280 F.3d 901 (9th Cir. 2002) .................................................................. 15

*AFA v. Mesa Air Grp.,*
    567 F.3d 1043 (9th Cir. 2009) ............................................15, 22-23, 25, 26

*AFA v. Texas Int'l Airlines, Inc.,*
    411 F. Supp. 954 (S.D. Tex. 1976) ........................................................... 26

*AFA v. United Airlines, Inc.,*
    976 F.2d 102 (2d Cir. 1992) ............................................................... 15, 41

*Airline Profs. Ass'n Teamster Local 1224 v. ABX Air, Inc.,*
    274 F.3d 1023 (6th Cir. 2001) ................................................ 15, 20, 23, 38

*Airline Profs. Ass'n, Teamster Local Union 1224 v. ABX Air, Inc.,*
    400 F.3d 411 (6th Cir. 2005) ............................................... 15, 20, 37-38

*Allied Fed'n BMWE v. CSX Transp., Inc.,*
    No. 3:21-CV-00013, 2022 WL 1156982 (W.D. Ky. Apr. 19, 2022) ...................... 20

*ALPA v. Am. Airlines, Inc.,*
    898 F.2d 462 (5th Cir. 1990) .................................................................. 15

*ALPA v. Eastern Air Lines, Inc.,*
    869 F.2d 1518 (D.C. Cir. 1989) ............................................................... 14

*ALPA v. Guilford Transp. Indus., Inc.,*
    399 F.3d 89 (1st Cir. 2005) .................................................................... 15

*ALPA v. Mesa Airlines, Inc.,*
    No. 1:17-cv-236, 2017 WL 2837135 (E.D. Va. June 29, 2017) ...................... 20, 23

*Appalachian Regional Healthcare v. United Steelworkers of America,*
    245 F.3d 601 (6th Cir. 2001) .................................................................. 20

*Bhd. of Locomotive Eng'rs and Trainmen v. UTU,*
    700 F.3d 891 (6th Cir. 2012) ................................................... 38

*Bhd. of Locomotive Eng'rs v. Long Island R.R.,*
    85 F.3d 35 (2d Cir. 1996) ......................................................... 15

*Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.,*
    394 U.S. 369 (1969) ................................................................. 39

*Bhd. of Ry. Carmen v. Mo. Pac. R.R.,*
    944 F.2d 1422 (8th Cir. 1991) ............................................ 15, 25

*Bhd. Ry. Carmen v. Norfolk & W. Ry. Co.,*
    745 F.2d 370 (6th Cir. 1984) ................................................... 25

*BLET GCA UP v. Union Pac. R.R. Co.,*
    988 F.3d 409 (7th Cir. 2021) ................................................ 9, 15

*BMWE v. Atchison, T. & S.F. Ry.,*
    138 F.3d 635 (7th Cir. 1997) ................................................... 33

*BMWE v. BNSF Ry.,*
    270 F.3d 637 (8th Cir. 2001) ................................................... 14

*BMWE v. BNSF Ry., Inc.,*
    834 F.3d 1071 (9th Cir. 2016) ................................................. 15

*BMWE v. Burlington N. & S.F. Ry.,*
    596 F.3d 1217 (10th Cir. 2010) ............................................... 14

*BMWE v. CSX Transp., Inc.,*
    143 F. App'x 155 (11th Cir. 2005) (per curiam).............. 12, 13, 15

*BMWE v. Norfolk S. Ry.,*
    745 F.3d 808 (7th Cir. 2014) ............................................... 15, 38

*BMWE v. Union Pac. R.R.,*
    19 F. App'x 731 (10th Cir. 2000) ............................................ 15

*BNSF Ry. Co. v. BLE*,
No. 01 C 7743, 2002 WL 47963 (N.D. Ill. Jan. 14, 2002) ........................................ 25

*BRC v. Atchison, T. & S. F. Ry. Co.*,
PLB No. 5264, Award No. 1 (Arb. Goldstein, 1994) ................................................ 40

*BRS v. S. Ry.*,
NRAB 3d Div., Award No. 23133 (Arb. Scheinman, 1981) ................................... 40

*Capraro v. United Parcel Service Co.*,
993 F.2d 328 (3d Cir. 1993) ...................................................................................... 38

*\*Chicago & North Western Transp. Co. v. RLEA*,
908 F.2d 144 (7th Cir. 1990) ........................................................ 20, 27, 28, 39, 44

*\*Consolidated Rail Corp. v. RLEA*,
491 U.S. 299 (1989) ....................................................................................*passim*

*\*CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*,
327 F.3d 1309 (11th Cir. 2003) ...................................... 5, 7, 8, 13, 14, 15, 33

*CSX Transp. v. United Transp. Union*,
395 F.3d 365 (6th Cir. 2005) ..................................................................................... 15

*Detroit & The Shore Line Railroad Co. v. United Transp. Union*,
396 U.S. 142 (1969) ....................................................................................*passim*

*Elgin, J. & E. Ry. Co. v. Burley*,
325 U.S. 711 (1945) ................................................................................................... 12

*Empresa Ecuatoriana de Aviacion, S.A. v. Dist. Lodge No. 100*,
690 F.2d 838 (11th Cir. 1982) .............................................................................. 8, 28

*Fitzgerald v. Seaboard Sysm. R.R., Inc.*,
760 F.2d 1249 (11th Cir. 1985) .................................................................................. 7

*Gen. Comm. of Adjustment, UTU, W. Md. Ry. Co. v. CSX R.R. Corp.*,
893 F.2d 584 (3d Cir. 1990) ............................................................................ 5, 15, 28

*Hilbert v. Penn. R. Co.*,
    290 F.2d 881 (7th Cir. 1961) ........................................ 28

*IBT v. Amerijet Int'l, Inc.*,
    755 F. Supp.2d 1243 (S.D. Fla. 2010)........................... 23

*IBT v. Southwest Airlines Co.*,
    875 F.2d 1129 (5th Cir. 1989) (*en banc*)...................... 23

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ..................................................... 7

*Lawrence v. Dunbar*,
    919 F.2d 1525 (11th Cir. 1990) (*per curiam*).................. 7

*Maine Cent. R.R. Co. v. United Transp. Union*,
    787 F.2d 780 (1st Cir. 1986) ........................................ 15

*Nat'l Ry. Labor Conf. v. IAM*,
    830 F.2d 741 (7th Cir. 1987) ........................................ 14

*NLRB v. American Nat'l Ins. Co.*,
    343 U.S. 395 (1952) ......................................... 17, 19, 21, 38

*Norfolk & Portsmouth Belt Line R.R. Co. v. Bhd. of R.R. Trainmen, Lodge No.
514*, 248 F.2d 34 (4th Cir. 1957) ...................................... 21

*Nw. Airlines, Inc. v. ALPA*,
    442 F.2d 251 (8th Cir. 1971) .......................................38-39

*Pittsburgh & L.E. R. Co. v. RLEA*,
    491 U.S. 490 (1989) ..............................24, 42, 43-44, 45

*Railroad Telegraphers v. Chicago & North Western Railroad Co.*,
    362 U.S. 330 (1960) ...........................................*passim*

*Railway Labor Execs. Ass'n v. Chesapeake W. Ry.*,
    915 F.2d 116 (4th Cir. 1990) ........................................ 15

vii

*Rutland Ry. Co. v. Bhd,. Of Locomotive Eng'rs,*
    307 F.2d 21 (2d Cir. 1962) ............................................................. 23

*Ry. Express Agency, Inc. v. Bhd. Of Ry., Airline & SS Clerks,*
    437 F.2d 388 (5th Cir. 1971) ........................................................ 23

*Ry. Labor Execs. Ass'n v. Norfolk & W. Ry. Co.,*
    833 F.2d 700 (7th Cir. 1987) ........................................................ 14

*Sanzari v. Metro-North R. Co.,*
    19-cv-8689 (LJL), 2021 WL 467339 (S.D.N.Y. Feb. 9, 2021) ................................. 20

*Sheet Metal Workers' Int'l Ass'n v. Burlington N. R.R. Co.,*
    893 F.2d 199 (8th Cir. 1990) ........................................................ 14

*Smith v. U.S.,*
    7 F.4th 963 (11th Cir. 2021) ......................................................... 7

*Southwest Airlines Pilots Ass'n v. Southwest Airlines Co.,*
    No. 3:21-cv-02065-M, 2021 WL 4975010 (N.D. Tex. Oct. 26, 2021) ..................... 23

*Stewart v. Spirit Airlines, Inc.,*
    503 F. App'x 814 (11th Cir. 2013) (per curiam) ........................................ 12

*United Steelworkers of America v. Warrior & Gulf Nav. Co.,*
    363 U.S. (1960) ...................................................... 17, 19-20, 38

*UTU v. CSX Transp., Inc.,*
    No. 3:08-cv-374-J-16HTS, 2009 WL 462722 (M.D. Fla. Feb. 23,2009) ................. 23

*UTU v. River Terminal Ry.,*
    142 F.3d 438 (6th Cir. 1998) (per curiam, unpublished) .......................... 25

## Statutes and Federal Rules          Page(s)

28 U.S.C. § 1291 ....................................................................... 1

28 U.S.C. § 1331 ....................................................................... 1

28 U.S.C. § 1337 ....................................................................... 1

45 U.S.C. § 151 ........................................................................................ 1

45 U.S.C. § 151a(1). .............................................................................. 8

45 U.S.C. § 153 First(i) ....................................................................... 12

45 U.S.C. § 181 ...................................................................................... 1

45 U.S.C. § 184 .................................................................................... 12

Fed.R.Civ.P. 12(b)(1) ........................................................................... 4

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 as the complaint filed by Plaintiff-Appellant Professional Airline Flight Control Association ("PAFCA"), sought relief under the Railway Labor Act ("RLA"), 45 U.S.C. § 151.

The district court issued an order granting the motion to dismiss filed by Defendant-Appellee Spirit Airlines, Inc. ("Spirit") on March 25, 2022. PAFCA filed its notice of appeal on April 22, 2022. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Did the district court properly dismiss PAFCA's complaint for lack of subject matter jurisdiction on the ground that PAFCA's claims raise a minor dispute, as that term is defined in the RLA?

## STATEMENT OF THE CASE

### Statement of Facts[1]

Spirit is a commercial airline headquartered in Miramar, Florida and a common carrier by air engaged in interstate commerce within the meaning of the RLA, 45 U.S.C. § 181. PAFCA has been the exclusive collective bargaining representative of Spirit's

---

[1] References to the record are to the docket entry number below followed by the relevant page, paragraph, or section numbers. PAFCA's brief to this Court is cited as "Brief" followed by its page numbers.

dispatchers, known as Flight Dispatch Officers ("FDOs"), since February 2018, when it replaced the FDOs' previous union. Doc. 10, ¶¶ 2-5; Doc. 12-1, ¶¶ 5, 12-13.

The Spirit-PAFCA Collective Bargaining Agreement ("CBA"), the first between the parties, became effective in October 2018.   Doc. 10, ¶ 7; Doc. 12-1, ¶¶ 5-6. Relevant here, it reserves to Spirit the right to determine where FDOs will perform their work. It contains a broad management rights clause stating that, "[e]xcept as restricted by an express provision of this Agreement, the Company shall retain all rights to manage and operate its business and workforce." Doc. 10-1, § 18.A. That general declaration is followed by a lengthy list of examples of the rights reserved to Spirit, "including but not limited to the right … *to transfer operations or part of operations*." *Id.* (emphasis added).

Although the CBA does not limit Spirit's decision to relocate or transfer operations, it contains provisions regarding when Spirit is obliged to bargain over certain effects of that decision. For example, Section 6.D. provides that "Where the Company opts to relocate the dispatch office to a new domicile more than fifty (50) AAA miles from its current location, the parties will meet to discuss and agree upon moving expenses for affected employees." *Id.*, § 6.D. Section 20.B. requires orders regarding employee "transfers" and "relocation" to be in writing, while Section 20.D. requires Spirit to "provide an opportunity for [PAFCA] input regarding functionality and ergonomics . . . before the Company relocates the Dispatch Office." *Id.*, §§ 20.B., 20.D.

2

Spirit's FDOs (as well as other employees not represented by PAFCA) worked out of a single Operations Control Center ("OCC") in Miramar, Florida where Spirit is headquartered. Threats of hurricanes would force Spirit to evacuate the OCC, disrupting Spirit's operations. Accordingly, in February 2020, Spirit announced it would move the OCC and the nearly 250 employees working there to a new facility near Nashville, Tennessee. Spirit met with PAFCA to discuss moving expenses associated with the relocation. Doc. 10, ¶ 9-11; Doc. 12-1, ¶ 8-10, 15.

Spirit subsequently changed its plans and decided instead to open a second OCC in Orlando. Although it was under no obligation to do so, Spirit voluntarily engaged in negotiations with PAFCA over certain details of how Spirit's dual OCC operation would affect the FDOs. The parties reached tentative agreement on a Memorandum of Understanding addressing those issues, but the FDOs voted it down. Doc. 12-1, ¶¶ 16-21.

Although Spirit continued discussions with PAFCA, efforts to reach agreement failed. On January 28, 2021, Spirit informed PAFCA that it would move forward with opening the second OCC. PAFCA sued, alleging that Spirit's decision violated the RLA. *Id.,* ¶¶ 22-27; Doc. 10, ¶¶ 17-18.

## Course of Proceedings and Disposition Below

Spirit moved to dismiss PAFCA's complaint because it raised a non-justiciable minor dispute under the standard established by the Supreme Court in *Consolidated Rail*

*Corp. v. RLEA*, 491 U.S. 299 (1989) ("*Conrail*"). PAFCA thereafter filed an amended complaint, which repeated its claims that Spirit violated the RLA.

In Count I, PAFCA alleged that Spirit violated the RLA's obligation to maintain the "status quo" pending exhaustion of the procedures applicable to "major" disputes under the RLA. Doc. 10, ¶¶ 22-23. In Count II, PAFCA alleged that Spirit's actions violated the RLA's duty to "make and maintain" agreements. *Id.*, ¶¶ 29-30. Lastly, PAFCA added a new Count III which alleged that even if the dispute was minor, the court should enjoin the opening of the Orlando OCC pending the outcome of the minor dispute arbitration process. *Id.*, ¶¶ 1, 37-42.

Spirit again moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(1). Spirit argued that, under *Conrail*, its position that the CBA gave it the right to open a second OCC was at least "arguably justified," and thus Counts I and II raised a minor dispute over which the court lacked subject matter jurisdiction. Doc. 12, pp. 19-22.[2] In its opposition, PAFCA virtually ignored *Conrail* and instead relied on two earlier Supreme Court decisions that it described as the "controlling authorities in this case": *Detroit & The Shore Line Railroad Co. v. United Transp. Union*, 396 U.S. 142, 148 (1969) ("*Shore Line*"), and *Railroad Telegraphers v. Chicago & North Western Railroad Co.*, 362 U.S. 330 (1960) ("*Telegraphers*"). Doc. 21, pp. 2, 8-12. It also argued that Spirit's position was not

---

[2] Spirit moved to dismiss Count III because PAFCA had not satisfied the narrow grounds for an injunction pending arbitration of a minor dispute. Doc. 12, pp. 18-20. The district court ruled against PAFCA on the issue, and PAFCA has not appealed it.

"arguably justified" under the CBA. *Id.,* pp. 13-15. Spirit's reply brief reiterated that *Conrail* is the controlling precedent in analyzing whether a dispute is major or minor, and that PAFCA failed to show that Spirit's interpretation of the CBA was frivolous or obviously insubstantial under *Conrail.* Doc. 27, pp. 2-10.

The district court granted Spirit's motion to dismiss. The court began its analysis by reviewing the differences between major and minor disputes and how the line between them is drawn under *Conrail* and its progeny—including this Court's observation that "where any 'reasonable doubt exists as to whether the dispute is major or minor, we will deem it to be minor.'" Doc. 50, pp. 6-8 (quoting *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1321 (11th Cir. 2003) ("*CSX Transp.*")). Under this precedent, the court held that "Spirit easily meets *Conrail*'s 'arguably justified' standard." *Id.*, p. 9. Indeed, the CBA's "sweeping" management rights clause was, "standing alone, probably enough for Spirit to satisfy Conrail's relatively low bar." *Id.* Yet, the court noted, "there's (much) more," including the CBA provisions addressing when Spirit "opts" to relocate its operations and regarding employee "transfers" and "relocation." *Id.*, pp. 9-10. It held that although PAFCA's contrary interpretation of these provisions could carry the day in arbitration, it is "simply not our role to 'consider the merits of the underlying dispute'—to determine, in other words, whether the CBA does (or does not) allow Spirit to transfer part of its operations to Orlando." *Id.*, p. 10 (quoting *Gen. Comm. of Adjustment, UTU, W. Md. Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584, 592 (3d Cir. 1990) (cleaned up)).

5

The district court rejected PAFCA's efforts to extricate itself from the *Conrail* standard by relying on *Shore Line* and *Telegraphers*. *First*, it found that "those cases are completely irrelevant here" in that they both involved "what should happen *in the event* of a major dispute [but] neither helps us answer the threshold question we face today: What constitutes a major dispute in the first instance?" *Id*., pp. 11-12. (emphasis in original). *Second*, it held that PAFCA misconstrued those decisions by incorrectly contending that they established the proposition that "no inherent management prerogative exists to change work assignments," and thus Spirit could not have "retained" the right to transfer operations. *Id*., p. 16. Indeed, PAFCA conflated two distinct concepts: management (or "managerial") prerogatives over which, as a matter of law, employers could not be forced to bargain at all; and rights over which an employer could be required to bargain but which the employer retained unless modified by the express or implied terms of a CBA. *Id*., pp. 16-18. Moreover, PAFCA's strained interpretation of the management rights clause also was at odds with the "plain text of the CBA." *Id*., p. 18.

The district court likewise found unpersuasive PAFCA's contention that the obligation to negotiate moving expenses when Spirit chose to relocate the OCC in its entirety meant Spirit could not open a second OCC. Even if that argument was "plausible," Spirit's contrary interpretation was not "frivolous" or "obviously insubstantial," particularly when considered "in light of the agreement as a whole." *Id*., pp. 18-19. Thus, "PAFCA's argument only highlights … that this case presents a minor

6

dispute—a reasonable disagreement over the interpretation of the CBA—that must be resolved by the adjustment board, not a federal judge." *Id.*, p. 19. Because PAFCA's claims presented a minor dispute, the court dismissed for lack of subject matter jurisdiction. *Id.* at pp. 19-20, n. 5.

## <u>STANDARD OF REVIEW</u>

This Court reviews *de novo* a district court's dismissal of a complaint for lack of subject matter jurisdiction. *Smith v. U.S.*, 7 F.4th 963, 973 (11th Cir. 2021).

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Thus, it is "presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id. See also Fitzgerald v. Seaboard System. R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985) (recognizing "presumption against federal court jurisdiction").

Spirit's motion to dismiss made both a facial and factual attack on the court's subject matter jurisdiction. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990) (*per curiam*). The district court dismissed based on the facial challenge since "jurisdiction is plainly absent on the face of the complaint." Doc. 50, p. 5. It also noted that it would reach the same conclusion based on Spirit's factual challenge. *Id.* at 5, n. 2. Although, like the district court, Spirit focuses on its facial challenge here, this Court could affirm on either ground.

The "district court's classification of a dispute as major or minor under the RLA is a question of law we review de novo." *CSX Transp.*, 327 F.3d at 1320.

## SUMMARY OF THE ARGUMENT

This case involves a dispute over the interpretation and application of the Spirit-PAFCA CBA: specifically, whether Spirit may, under the terms of its CBA, open a second OCC without first reaching agreement with PAFCA to do so. Spirit believes it can; PAFCA disagrees.

Although Spirit believes its position is unassailable, that is not for the courts to resolve. Rather, as established in *Conrail* and dozens of decisions following it, when a carrier argues that its CBA permits it to take the challenged action, the role of the judiciary is simply to decide whether that position is "arguably justified"—that is, "neither obviously insubstantial or frivolous." *Conrail*, 491 U.S. at 310. If it is, the dispute is "minor" under the RLA, it is subject to compulsory arbitration, and the courts must dismiss for lack of subject matter jurisdiction. The court's "central responsibility," therefore, is "'that of taxonomist'—classifying the dispute as major or minor." *BLET GCA UP v. Union Pac. R.R. Co.*, 988 F.3d 409, 413 (7th Cir. 2021) (citation omitted). *See also CSX Transp.*, 327 F.3d at 1320 ("the district court is placed in the position to determine the nature of the dispute, without necessarily reaching the merits of the dispute"). Given the RLA's stated goal of avoiding interruptions to commerce that can occur as a result of "major" disputes,[3] there is a strong presumption that disputes are

---

[3] 45 U.S.C. § 151a(1). *See also Empresa Ecuatoriana de Aviacion, S.A. v. Dist. Lodge No. 100*, 690 F.2d 838, 843 (11th Cir. 1982) ("As if often stated, the purpose of the Act

minor. *See*, *e.g.*, *id.* at 1321 (if "reasonable doubt exists as to whether the dispute is major or minor, we will deem it to be minor"); *BLET GCA UP*, 988 F.3d at 413 ("'in making the choice between major and minor, there is a large thumb on the scale in favor of minor, and hence arbitration'") (citation omitted).

The district court correctly held that Spirit "easily" meets the *Conrail* standard. Doc. 50, p. 9. Indeed, the CBA's management rights clause specifically states that Spirit "shall retain *all rights* to manage and operate its business and workforce, including … the right … *to transfer operations or part of operations*," except as "restricted by an *express provision*" of the CBA. Doc. 10-1, § 18.A. (emphasis added). In other words, unless there is an express CBA provision prohibiting it—and there is not—the CBA explicitly gives Spirit the right to transfer part of its operations to a second OCC. As the district court held, this "provision is, standing alone, probably enough for Spirit to satisfy *Conrail*'s relatively low bar." Doc. 50, p. 9. In conjunction with the other provisions of the CBA, there can be no question that Spirit has met its burden.

Realizing that it cannot possibly prevail on its "major dispute" argument in light of *Conrail*, PAFCA opts for misdirection. It barely acknowledges *Conrail* (and misrepresents the holding of that case when it does) and does not even mention the numerous decisions discussing the low bar that a carrier must meet to show that a

_____

is to avoid interruption to commerce by providing dispute resolution machinery to prevent strikes.").

dispute is minor. Instead, PAFCA spends most of its brief below and to this Court discussing *Shore Line* and *Telegraphers*. Ignoring the *Conrail* line of cases does not make them any less relevant to—or dispositive of—PAFCA's claims. Neither *Shore Line* nor *Telegraphers* help PAFCA's cause as neither addressed the issue the Supreme Court resolved in *Conrail*: the standard to be applied to determine when is a dispute is minor or major. Rather, they concerned the scope of a carrier's obligations during *major* disputes. The district court rejected PAFCA's reliance on those decisions as "completely irrelevant" here. Doc. 50, pp. 11-12. This Court should do the same.

Faced with the impossible task of overcoming *Conrail* and Section 18.A., the management rights clause, PAFCA resorts to arguing that Section 18.A. doesn't mean what it says. Instead, PAFCA contends that once Spirit's FDOs unionized, Spirit no longer had the right to unilaterally change *any* employee working conditions based on the absence of a provision in the CBA prohibiting it from doing so. Thus, PAFCA's theory goes, Spirit could not have "retained" those rights in Section 18.A.

PAFCA's contention is incorrect for several reasons, including that none of the cases on which it relies involved a management rights clause negotiated by the parties, or how such a provision factors into the major/minor dispute analysis. But for this Court's purposes, the merits of PAFCA's position is beside the point. What is relevant is that PAFCA's argument confirms that resolution of the dispute turns on interpretation of the CBA, rendering this a minor dispute.

10

Section 18.A. states in pertinent part that Spirit "shall *retain all rights* to manage and operate its business and workforce." Doc. 10-1, p. § 18.A. (emphasis added). Spirit contends that the "rights" referenced in the management rights clause are those it would have continued to have if the FDOs had not unionized—or, to put it another way, the rights Spirit had *prior* to its FDOs becoming unionized. Those rights unquestionably included the unilateral authority to transfer operations (as well as to change other working conditions), and thus that is among the rights Spirit "retained" in Section 18.A. PAFCA, as noted, interprets Section 18.A. as relating to the "rights" that Spirit had *after* the FDOs unionized, which (it asserts) do not include the right to unilaterally change working conditions. Thus, PAFCA claims that the only rights Spirit could have "retained" in Section 18.A. were those relating to its managerial prerogatives—even though Section 18.A. lists rights involving *both* employee working conditions and managerial prerogative among those retained by Spirit.

Regardless of whose position is correct regarding the scope of the rights Spirit retained in the management rights clause. resolving it clearly requires interpretation of the CBA, thus confirming that this a minor dispute. Thus, this Court should affirm the district court's dismissal of PAFCA's complaint.

11

## ARGUMENT

## I.    *CONRAIL* AND ITS PROGENY CONTROL THE ANALYSIS OF WHETHER A DISPUTE IS MAJOR OR MINOR.

There are two types of contractual disputes under the RLA: major and minor. *Conrail*, 491 U.S. at 302. The terms "major" and "minor" have nothing to do with the "importance of the issue presented." *Id.* at 305. Rather, they relate to the nature of the dispute, and how they are to be resolved. Major disputes arise from the negotiation or renegotiation of collective bargaining agreements, while minor disputes involve the interpretation or application of such agreements. *Id.* at 302-03 (citing *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945)). *See also Stewart v. Spirit Airlines, Inc.*, 503 F. App'x 814, 817-18 (11th Cir. 2013) (per curiam); *BMWE v. CSX Transp., Inc.*, 143 F. App'x 155, 158-60 (11th Cir. 2005) (per curiam) ("*BMWE*"). In short, "major disputes seek to create contractual rights, minor disputes to enforce them." *Conrail*, 491 U.S. at 302.

For major disputes, the RLA "requires the parties to undergo a lengthy process of bargaining and mediation" before either party may resort to self-help that could interrupt interstate commerce. *Conrail*, 491 U.S. at 302-03. By contrast, minor disputes are channeled into arbitration which, in the airline industry, is conducted before the System Board of Adjustment created by the parties in their labor contract. *Id.* at 303; 45 U.S.C. § 153 First(i); 45 U.S.C. § 184. Those arbitral boards have exclusive jurisdiction to resolve the merits of minor disputes. *Conrail*, 491 U.S. at 304.

12

**A.      Under *Conrail*, A Dispute is Minor Unless the Carrier's Position is "Frivolous" or "Obviously Insubstantial."**

Prior to *Conrail*, the Supreme Court had "not articulated an explicit standard for differentiating between major and minor disputes." *Id.* at 302. The Circuit Courts had employed a variety of formulations, including "not arguably justified," "obviously insubstantial," "spurious," and "frivolous." *Id.* at 306. In *Conrail*, the Court held that these variants were effectively the same in their outcome, and "'illustrate the relatively light burden which the railroad must bear' in establishing exclusive arbitral jurisdiction under the RLA." *Id.* at 307 (quoting *BMWE, Lodge 16 v. Burlington Northern R. Co.*, 802 F.2d, 1016, 1022 (8th Cir. 1986)). It established the following standard for determining whether a dispute is major or minor: "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Conrail*, 491 U.S. at 307.

Subsequent decisions stress that *Conrail* creates a low bar that is heavily weighted in favor of finding disputes to be minor. This Court, for example, has held that the *Conrail* "standard for 'arguability' is low, and . . . 'if a reasonable doubt exists as to whether the dispute is major or minor, we will deem it to be minor.'" *BMWE*, 143 F. App'x at 160 (quoting *CSX Transp.*, 327 F.3d at 1321). *See also CSX Transp.*, 327 F.3d at 1321 (in *Conrail* the "Court noted that the threshold to bind the parties to the

13

'exclusive arbitral jurisdiction' accompanying a minor dispute is a low one"). Other Circuits likewise have emphasized this point. *See, e.g., BMWE v. Burlington N. & S.F. Ry.*, 596 F.3d 1217, 1223 (10th Cir. 2010) ("the default position for courts is to deem a dispute as minor if it even remotely touches on the terms of the relevant collective bargaining agreement"); *BMWE v. BNSF Ry.*, 270 F.3d 637, 639 (8th Cir. 2001) ("if doubt arises about the classification of a dispute, the dispute is also considered to be minor"); *ALPA v. Eastern Air Lines, Inc.*, 869 F.2d 1518, 1522 (D.C. Cir. 1989) (noting the "strong presumption" that a dispute is minor and that "few disputes that arise during the term of a [CBA] cannot arguably be resolved by reference to the agreement"). Indeed, as long as the carrier's justification is "arguable" or "plausible," the dispute is minor, even if the court believes the carrier's position is "questionable" or "improbable"—and even if it believes the carrier is affirmatively wrong.[4] Moreover, "it is not within the scope of [the court's] review to decide the merits of the dispute before us, but merely to classify it as major or minor." *CSX Transp.*, 327 F.3d at 1322.[5] Given

---

[4] *See, e.g., Nat'l Ry. Labor Conf. v. IAM*, 830 F.2d 741, 749 (7th Cir. 1987) ("the fact that a contract interpretation is questionable, and may be wrong, does not make it frivolous"); *Sheet Metal Workers' Int'l Ass'n v. Burlington N. R.R. Co.*, 893 F.2d 199, 205 (8th Cir. 1990) (same; carrier's "contractual justification, however improbable it may be, is nonetheless plausible"); *ALPA v. Eastern,* 869 F.2d at 1521 (if dispute involves proper application or meaning of a contract provision, "the dispute is a minor one that must be submitted to arbitration, *even if the court believes that one party's interpretation of the contract lacks merit")* (emphasis in original).

[5] *See also Ry. Labor Execs. Ass'n v. Norfolk & W. Ry. Co.*, 833 F.2d 700, 704 (7th Cir. 1987) (the court "does not consider the merits of the underlying dispute; its role

the low threshold established by *Conrail*, it is unsurprising that the overwhelming majority of decisions applying it have found RLA contractual disputes to be minor.[6]

### B.    PAFCA Misrepresents The Holding of *Conrail*.

In light of the overwhelming hurdle *Conrail* poses to its suit, PAFCA barely mentions the decision in its brief to the Court and does not even acknowledge the numerous cases emphasizing the low threshold a carrier must meet to show that a dispute is minor including those from this Court.  *See, e.g., CSX Transp.*, 327 F.3d at 1321; *BMWE*, 143 F. App'x at 160.  When it does discuss *Conrail*, PAFCA badly

---

is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision"); *Maine Cent. R.R. Co. v. United Transp. Union*, 787 F.2d 780, 782 (1st Cir. 1986) (once court finds carrier's position is "arguable," "the court's inquiry must end; it is not for it to weigh, and decide who has the better of the argument.  If the court did this, it overstepped its bounds and usurped the arbitrator's function.").

[6] *E.g., CSX Transp.*, 327 F.3d at 1322; *BMWE*, 143 F. App'x at 161  *BLET GCA UP,* 988 F.3d at 413; *BMWE v. BNSF Ry., Inc.,* 834 F.3d 1071, 1076-77 (9th Cir. 2016); *BMWE v. Norfolk S. Ry.*, 745 F.3d 808 (7th Cir. 2014); *AFA v. Mesa Air Grp.*, 567 F.3d 1043, 1047 (9th Cir. 2009); *Airline Profs. Ass'n, Teamster Local Union 1224 v. ABX Air, Inc.,* 400 F.3d 411, 416 (6th Cir. 2005) ("*ABX II*"); *ALPA v. Guilford Transp. Indus., Inc.,* 399 F.3d 89 (1st Cir. 2005); *CSX Transp. v. United Transp. Union*, 395 F.3d 365 (6th Cir. 2005); *AFA v. Horizon Air Indus., Inc.,* 280 F.3d 901, 904-05 (9th Cir. 2002); *Airline Profs. Ass'n Teamster Local 1224 v. ABX Air, Inc.,* 274 F.3d 1023 (6th Cir. 2001) ("*ABX I*"); *BMWE v. Union Pac. R.R.*, 19 F. App'x 731 (10th Cir. 2000); *Bhd. of Locomotive Eng'rs v. Long Island R.R.*, 85 F.3d 35 (2d Cir. 1996); *AFA v. United Airlines, Inc.*, 976 F.2d 102 (2d Cir. 1992); *Bhd. of Ry. Carmen v. Mo. Pac. R.R.*, 944 F.2d 1422 (8th Cir. 1991); *Railway Labor Execs. Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116 (4th Cir. 1990); *ALPA v. Am. Airlines, Inc.*, 898 F.2d 462 (5th Cir. 1990); *Gen. Comm. of Adjustment, UTU*, 893 F.2d at 591.

misrepresents the Court's holding. Choosing to ignore or mischaracterize *Conrail* and its progeny does not make them any less damaging to PAFCA's cause.

PAFCA asserts that under *Conrail*, a dispute can only be minor if "it involves the interpretation or application of a *particular* contract provision," and that the "*referenced* provision" must arguably justify the employer's actions. Brief, p. 8 (emphasis added). That was not what *Conrail* held.[7] On the contrary, in *Conrail* "[n]either party relie[d] on any express provision of the agreement; indeed, *the agreement is not part of the record before us*." *Conrail*, 491 U.S. at 31 (emphasis added). There was no provision in the relevant CBA either explicitly permitting or prohibiting the challenged action. However, in light of the unique nature of CBAs as contrasted to other types of contracts, the employer could arguably have the right to act even in the absence of any provision permitting (or prohibiting) it:

> This Court has observed: "A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. '... [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant.'"

---

[7] To be clear, Spirit's position—with which the district court agreed—is that there *are* "particular" contract provisions that arguably justify (at a minimum) Spirit's authority to unilaterally open a second OCC, including (but not limited to) the CBA's management rights clause. Doc. 50, pp. 9-10. *See generally* Section III, *infra.* Thus, not even PAFCA's misrepresentation of the *Conrail* standard would save its claims.

*Conrail*, 491 U.S. at 311-12 (quoting *Transp. Union v. Union Pac. R. Co.*, 385 U.S. 157, 160-61 (1966), quoting in turn *United Steelworkers of America v. Warrior & Gulf Nav. Co.:*, 363 U.S., 574, 578–579 (1960)).

The *Conrail* Court further discussed the flexibility that parties negotiate into their CBAs, and how that flexibility factors into the minor dispute analysis, in rejecting the union's argument that the employer should have to meet a higher standard before implementing a change that the CBA arguably permitted it to make:

> This approach unduly constrains the freedom of unions and employers to contract for discretion. Collective-bargaining agreements often incorporate express or implied terms that are designed to give management, or the union, a degree of freedom of action within a specified area of activity. We have held under the National Labor Relations Act (NLRA) that no principle of labor law prohibits "[b]argaining for ... flexible treatment" and requires instead that, for each working condition, the employer "agre[e] to freeze a standard into a contract." We find no difference between the NLRA and the RLA in this respect. Yet the Union would subject to especially strict scrutiny the bona fides of contractual claims arising out of contract terms that grant management the power to respond flexibly to changing circumstances.

*Conrail*, 491 U.S. at 308-09 (quoting *NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395, 408 (1952); other citations omitted).[8]

---

[8] As is discussed in Section I.C., *infra*, the Supreme Court's comments in *American Nat'l Ins.* that *Conrail* cited approvingly regarding an employer's right to bargain for "flexible treatment" arose in the context of an employer's right to negotiate a management rights clause that addressed working conditions such as work schedules and discipline. *See American Nat'l Ins.*, 343 U.S. at 399-400, 408.

In light of the Supreme Court's observations about the inherent flexibility in CBAs, courts regularly find disputes minor, even where there is no "particular" contractual provision that addresses the issue.  *See* Section III.B., *infra*, and cases discussed therein.  *Conrail* itself was such a case.  Like PAFCA here, the union in *Conrail* argued that the absence of contract language regarding the carrier's challenged action (its unilateral decision to implement drug testing as part of employee physical examinations) meant that there had been no "meeting of the minds" between the parties and, thus, the dispute must be major.  The Court rejected that argument:

> There need be no "meeting of the minds" between the parties on the details of drug-testing methods or confidentiality standards for Conrail's current drug-testing program arguably to be justified by the parties' agreement.  As we have noted, labor laws do not require all the details of particular practices to be worked out in advance. Conrail's claim that drug testing is an area in which Conrail retains a degree of discretion finds some support in the fact that the Union never before has intervened in the procedural details of Conrail's drug testing: such testing has been performed—like other medical tests—according to standards unilaterally promulgated by Conrail. *Thus, the absence of a specific agreement between the parties regarding testing procedures and confidentiality does not sufficiently undermine Conrail's contractual claim to require that this dispute be classified as "major."*

*Id.* at 317-18 (emphasis added).

## C.  Management Rights Clauses Can Serve As The Basis For Finding A Dispute Minor.

As discussed above, PAFCA mischaracterizes *Conrail* by asserting that an employer must point to a "particular" provision in a CBA to justify its actions for a

dispute to be minor. Regardless, Spirit has pointed to such provisions here, including the management rights clause.

*Conrail* held that CBAs "often incorporate express or implied terms that are designed to give management, or the union, a degree of freedom of action within a specified area of activity," and rejected the argument that "contract terms that grant management the power to respond flexibly to changing circumstances" should be subject to a higher standard than "arguably justified." *Conrail*, 491 U.S. at 308-09. A management rights clause is a paradigmatic example of a term designed to give the employer such flexibility. Indeed, the *Conrail* Court quoted approvingly from its decision in *American Nat'l Ins.* in which, in the context of a management rights clause, the Court held that employers were free to bargain for "flexible treatment" and were not obligated to agree to "freeze" working conditions standards into their CBAs. *Id.* at 311-12 (quoting *American Nat'l Ins.,* 343 U.S. at 408). And although *American Nat'l Ins.* was an NLRA case, Conrail found "no difference between the NLRA and the RLA in this respect." *Id.* at 312.

When an employer is non-union, obviously there are no contractual restrictions on its exercise of its rights to manage its business and workforce as it sees fit. After employees unionize, the union negotiates limitations on the employer's prior ability to exercise those rights unilaterally; absent such restrictions, management retains that authority, regardless of whether the CBA contains an explicit provision to that effect. As the Supreme Court held in *Warrior & Gulf*:

> Collective bargaining agreements regulate or restrict the exercise of management functions; they do not oust management from the performance of them. Management hires and fires, pays and promotes, supervises and plans. All these are part of its function, and absent a collective bargaining agreement, it may be exercised freely except as limited by public law and by the willingness of employees to work under the particular, unilaterally imposed conditions.

363 U.S. at 583. Thus, the CBA "need not include provisions permitting management action on every conceivable employment matter; rather, on issues not discussed in the Agreement, management retains discretion." *Appalachian Regional Healthcare v. United Steelworkers of America*, 245 F.3d 601, 606 (6th Cir. 2001) (citing *Warrior & Gulf*). This concept has been recognized in numerous RLA cases as well.[9]

---

[9] *See ABX II*, 400 F.3d at 416 (where CBA does not contain either an express authorization or explicit prohibition of challenged action, dispute is minor "unless under the CBA or the law" employer did not even arguably retain discretion to take action)*; ABX I*, 274 F.3d at 1029, 1031 (because CBAs "are not complex codes that expressly regulate every conceivable employment matter," management "retains discretion with respect to the hiring, firing, promoting supervising, planning, and other management functions, except as limited by the collective bargaining agreement and public law"); *Chicago & North Western Transp. Co. v. RLEA*, 908 F.2d 144, 153 (7th Cir. 1990) ("what the agreements do not forbid, either explicitly or implicitly … the railroad is allowed to do as a matter of contract); *Allied Fed'n BMWE v. CSX Transp., Inc.*, No. 3:21-CV-00013, 2022 WL 1156982, *3-4 (W.D. Ky. Apr. 19, 2022) (citing carrier's inherent management rights in finding dispute over implementation of timekeeping system to be minor); *Sanzari v. Metro-North R. Co.*, 19-cv-8689 (LJL), 2021 WL 467339, *9 (S.D.N.Y. Feb. 9, 2021) (dispute minor where it was "at least arguably implicit that [carrier] had retained the unilateral right" to make changes to time management system); *ALPA v. Mesa Airlines, Inc.*, No. 1:17-cv-236, 2017 WL 2837135, *6 (E.D. Va. June 29, 2017) (dispute over carrier's bonus program minor even though bonus pay not expressly mentioned in management rights clause; this "is consistent with the Supreme Court's assessment that a collective bargaining agreement is a flexible document, 'a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.'") (quoting *Warrior & Gulf.*, 363 U.S. at 578–79).

20

*Warrior & Gulf* and other decisions hold that employers inherently retain the rights they had prior to unionization unless restricted by the CBA, even in the absence of an explicit management rights clause therein. Nevertheless, employers commonly negotiate such clauses to minimize future disputes over the scope of management's retained rights. *See, e.g., American Nat'l Ins.*, 343 U.S. at 407 (it is "manifest that bargaining for management functions clauses is common collective bargaining practice"); *Norfolk & Portsmouth Belt Line R.R. Co. v. Bhd. of R.R. Trainmen, Lodge No. 514*, 248 F.2d 34, 41 (4th Cir. 1957) ("A great majority of the collective bargaining agreements, by express provision or by implication, confer upon management the right and the power to make certain decisions without prior consultation with the representatives of the employees and to effectuate them in practice without the delay inherent in extended collective bargaining procedures.").

The management rights clause in the Spirit-PAFCA CBA is typical. It includes a list of the employer's rights "to manage and operate its business and workforce" that it retains "[e]xcept as restricted by an express provision" of the CBA. Doc. 10-1 at § 18.A. In other words, the clause requires the union to negotiate specific limitations or restrictions on the rights that the employer had prior to unionization; if it does not do so, management retains the flexibility and discretion to address those circumstances as it sees fit. *See Conrail*, 499 U.S. at 308 (noting that employers are free to "contract for discretion" and that CBAs "often incorporate express or implied terms that are

designed to give management, or the union, a degree of freedom of action within a specified area of activity").

Numerous courts have relied on management rights clauses in finding disputes minor. In *AFA v. Mesa*, for example, the airline had for years scheduled its flight attendants using the federal regulations applicable to pilots. When it decided to switch to using the regulations applicable to flight attendants, the union asserted a status quo violation. The CBA did not explicitly identify which set of regulations the airline had to use in scheduling its flight attendants. *AFA v. Mesa,* 567 F.3d at 1048. Like the Spirit-PAFCA CBA, the CBA contained a management rights clause under which the carrier "retains all authority and rights to manage its operations and direct its … work force" to the extent not "expressly restricted by the CBA," including the right to establish or amend "rules, regulations and procedures ... [and] to establish new routes, services, schedules and areas of service." *Id.*

Relying on those provisions, the Ninth Circuit held the dispute minor.[10] It noted that two other Circuits had "held in similar circumstances that the existence of a broad management rights clause is enough to create an 'arguable' question of contract interpretation when a CBA does not explicitly establish rules or policies governing

---

[10] PAFCA tries to distinguish *AFA v. Mesa* by claiming that the CBA there "contained a specific provision relating precisely to the scheduling question at issue." Brief, p. 21. It did not. As the Ninth Circuit noted, the scheduling provision did *not* specify which regulations had to be used for flight attendant scheduling. *AFA v. Mesa*, 567 F.3d at 1048.

working conditions." *Id.* (discussing *ABX I*, 274 F.3d at 1029, and *IBT v. Southwest Airlines Co.*, 875 F.2d 1129, 1135 (5th Cir. 1989) (*en banc*)).[11] Those decisions, the Ninth Circuit concluded, "reinforce our view that the management rights clauses in the CBAs here arguably provide justification for Mesa to unilaterally interpret and apply the ambiguous contractual language concerning the FARs." *Id.* Numerous district courts likewise have held disputes minor based on management rights clauses in RLA CBAs. *See, e.g., Southwest Airlines Pilots Ass'n v. Southwest Airlines Co.*, No. 3:21-cv-02065-M, 2021 WL 4975010, *11 (N.D. Tex. Oct. 26, 2021) (relying on management rights clause in finding dispute over COVID policies minor; " "in the absence of any provision prohibiting adoption of such policies, they are arguably justified under the Management Rights clause"); *ALPA v. Mesa*, No. 1:17-cv-236, 2017 WL 2837135, at *5-6 ("any dispute over whether the language within the Management Rights clause permits unilateral implementation of bonus programs presents a question of contract interpretation"); *IBT v. Amerijet Int'l, Inc.*, 755 F. Supp.2d 1243, 1250 (S.D. Fla. 2010) (relying on management rights clause to find dispute over termination of probationary pilot minor dispute); *UTU v. CSX Transp., Inc.*, No. 3:08-cv-374-J-16HTS, 2009 WL

---

[11] *IBT v. Southwest*, in turn, relied on two pre-*Conrail* cases which likewise found disputes minor based on management rights clauses. *See* 875 F.2d at 1134 (discussing *Ry. Express Agency, Inc. v. Bhd. Of Ry., Airline & SS Clerks*, 437 F.2d 388, 392 (5th Cir. 1971) (dispute over change in work assignments minor), *Rutland Ry. Co. v. Bhd, Of Locomotive Eng'rs*, 307 F.2d 21, 33-34 (2d Cir. 1962) (dispute over change in train schedule, which would reduce the number of jobs and change home terminals of some employees, minor)).

462722, *4 (M.D. Fla. Feb. 23, 2009) (dispute over manner in which employer filled temporary vacancies minor where "CBAs' provisions do not categorically prohibit the practice").

### D.   *Shore Line* And *Telegraphers* Do Not Establish The Standard To Be Applied In Determining Whether A Dispute Is Major Or Minor.

Recognizing that it cannot possible clear the hurdle created by the *Conrail* standard, PAFCA instead contends that *Shore Line* and *Telegraphers* are the governing precedent. As the district court held, those decisions are irrelevant here because neither addresses the issue this Court must decide: whether a dispute is major or minor in the first instance. Doc. 50, p. 12. The Supreme Court established the framework for resolving that question in *Conrail*, not in these earlier decisions. *See Conrail*, 491 U.S. at 302 ("This Court has not articulated an explicit standard for differentiating between major and minor disputes.").[12]

*Shore Line* did not involve the question of whether a dispute was major or minor, or a carrier argument that the CBA permitted it to take the challenged action. On the contrary, the dispute there undisputedly was major and thus the parties were subject to

---

[12] PAFCA now also claims *Pittsburgh & L.E. R. Co. v. RLEA*, 491 U.S. 490 (1989) ("*P&LE*"), supports its arguments—a decision that it did not even cite below. That reliance is misplaced, as is discussed in more detail in Section III.C. *infra*. Moreover, *P&LE*, had nothing to do with the distinction between major and minor disputes—an issue on which the Court had just ruled in *Conrail*, issued two days earlier. Rather, *P&LE* addressed whether the carrier was obligated to bargain at all over the exercise of a managerial prerogative—its decision to go out business—because of its effect on working conditions. *Id.* at 507-09.

the status quo.  The issue before the Court was the *scope* of a carrier's status quo obligation in a major dispute—specifically, whether it was limited to those working conditions explicitly set forth the CBA.  *Shore Line*, 396 U.S. at 143.  The Supreme Court held that the status quo could include a longstanding practice, even if that practice was not codified in the CBA, and that under the circumstances there, the parties' past practice had risen to the level of an implied contractual provision that was subject to the status quo.  *Id.* at 153.

The *Shore Line* Court had no occasion to consider the question that is now before this Court:  whether a carrier's position that the CBA permits it to take the action challenged by the union is arguably justified, and thus a minor dispute.  Resolution of that question is governed by the standard the Supreme Court subsequently announced in *Conrail*, and *Shore Line* has no bearing on that analysis.  Indeed, the Supreme Court made that very point in *Conrail* when it held that the *Shore Line* discussion of status quo "has no direct application to a minor dispute."  *Conrail*, 491 U.S. at 305, n. 5.  Many other courts likewise have found *Shore Line* inapposite in the context of deciding whether a dispute is major or minor.[13]  Where, as here, the carrier offers a non-frivolous

---

[13] *See, e.g.*, *AFA v. Mesa*, 567 F.3d at 1049 ("Before a federal court can even reach the analysis in *Shore Line* … it must find that the disagreement … is a major dispute."); *UTU v. River Terminal Ry.*, 142 F.3d 438 (6th Cir. 1998) (*per curiam*, unpublished) (union's reliance on *Shore Line* was "misplaced because the issue of characterizing a labor dispute as major or minor was not before the Court"); *Bhd. of Ry. Carmen.*, 944 F.2d at 1427 n. 5 (*Shore Line* is not applicable to the facts of this case, however, as … the possibility of a minor dispute was not addressed"); *Bhd. Ry. Carmen v. Norfolk & W. Ry. Co.*, 745 F.2d

interpretation of the parties' CBA, which arguably justify its decision, *Shore Line*'s discussion of the status quo is irrelevant.

In *AFA v. Mesa*, the Ninth Circuit rejected the same *Shore Line* argument that PAFCA makes here. Like PAFCA, the union relied on *Shore Line* in arguing that the carrier's change in how it had scheduled its flight attendants for many years violated the RLA. *AFA v. Mesa*, 567 F.3d at 1048. The court disagreed, noting that neither party in *Shore Line* "made an argument based on the terms of a CBA," and that the union's argument "ignores the Supreme Court's decision in *Conrail*." *Id.* at 1048-49. *Shore Line*, the court held, simply had no application:

> AFA relies upon *Shore Line* to argue that any status quo working condition — whether covered by a CBA or not — is protected by the RLA from unilateral change by management, and that federal courts can enjoin management from making such a unilateral change. We do not read *Shore Line* so broadly. AFA's interpretation of *Shore Line* would eliminate any distinction between major and minor disputes in cases where the union contends that management's action violates established practice, including cases

370, 376 (6th Cir. 1984) (*Shore Line* not relevant to major/minor dispute analysis because it "dealt only with the *scope* of the status quo requirement in a dispute that all assumed to be major") (emphasis in original); *BNSF Ry. Co. v. BLE*, No. 01 C 7743, 2002 WL 47963, at *9 (N.D. Ill. Jan. 14, 2002) (reliance on *Shore Line* "misplaced," relevant question was whether carrier violated CBA); *AFA v. Texas Int'l Airlines, Inc.*, 411 F. Supp. 954, 963 (S.D. Tex. 1976) (*Shore Line* inapposite to minor dispute because "Supreme Court considered only the question of defining the status quo provision of Section Six"). PAFCA discusses three of these decisions cited by the district court, arguing that they are distinguishable factually from the instant case. Brief, pp. 20-22. The court cited them, however, for the point that *Shore Line* is irrelevant to the major/minor dispute analysis (the same observation the Supreme Court made in *Conrail*, which PAFCA ignores). PAFCA does not even attempt to refute that aspect of these decisions.

26

>   where the CBA arguably (or even clearly) allows management to
>   change the status quo.

*Id.* at 1049.

PAFCA's reliance on *Telegraphers* is also misplaced. Like *Shore Line*, the parties were involved in a major dispute: negotiations to modify their CBA. During those negotiations, the union made a proposal to prohibit the railroad from abolishing jobs without the union's agreement. The carrier refused to bargain over that issue, arguing that it did not raise an RLA dispute at all but was rather an exercise of a managerial prerogative over which it was not required to negotiate. *Id.* at 332, 336-341.[14] The Supreme Court disagreed, holding that it was not a usurpation of a management prerogative for the union to seek bargaining "about the job security of its members." *Id.* at 336.

Unlike the carrier in *Telegraphers*, Spirit does not contend that its decision to open a second OCC is a matter of managerial prerogative, or that it could refuse to bargain in the future over a proposal to restrict its right to open a second OCC, should PAFCA make such a proposal. *See* Doc. 50, p. 15 (finding *Telegraphers* irrelevant because Spirit "has never contended that its decision to open a new control center is somehow immune from the strictures of the RLA—whether because of management prerogatives

---

[14] Managerial prerogatives are topics over which "the carrier is not required to bargain over and therefore is unlikely to surrender in bargaining, though nothing in the Act forbids it to do so." *Chicago & N.W. Transp.*, 908 F.2d at 152. "The union's insistence on bargaining over such matters confers no rights under section 6." *Id.*

or anything else"). Rather, Spirit argues that the *current* CBA gives it the right to open a second dispatch center. That is a separate basis, independent of "managerial prerogative," on which a carrier may proceed unilaterally without violating the status quo. *See Chicago & N.W. Transp.*, 908 F.2d at 152 (noting that there are "two types of carrier's entitlement to act unilaterally—contractual and prerogative"). Where, as here the dispute is over enforcement of existing rights, not efforts to create new ones, the dispute is minor. *Conrail*, 491 U.S. at 302. *See also Gen. Comm. of Adjustment, UTU*, 893 F.2d at 591 (court could not rely on *Telegraphers* because "unlike the situation here" the railroad did not contend its actions were justified by the CBA); *Empresa Ecuatoriana*, 690 F.2d at 843 (questions regarding scope of managerial discretion are minor disputes).[15]

---

[15] *Telegraphers* did make a passing reference to the major/minor distinction, confusingly suggesting that it turned on the importance of the issue. *Telegraphers,* 362 U.S. at 341 ("it is impossible to classify as a minor dispute this dispute relating to a major change, affecting jobs, in an existing collective bargaining agreement, rather than to mere infractions of the provisions of that agreement"). *See Hilbert v. Penn. R. Co.*, 290 F.2d 881, 885 (7th Cir. 1961) ("this use of the word 'major' is confusing as surely a major dispute does not depend on the number of people involved"). The Supreme Court definitively rejected that proposition in *Conrail*, holding that the demarcation between major and minor "does not turn on a case-by-case determination of the importance of the issue presented." *Conrail*, 491 U.S. at 305. *See also* Doc. 50, p. 14 n. 6.

## II.  SPIRIT EASILY SATISFIES THE *CONRAIL* STANDARD, AND THUS THE PARTIES' DISPUTE OVER THE OPENING OF A SECOND OCC IS MINOR.

### A.  The CBA's Management Rights Clause, Standing Alone, Arguably Justifies Spirit's Position.

In light of *Conrail* and the numerous decisions following it, the district court concluded that "Spirit easily meets *Conrail*'s 'arguably justified' standard."  Doc. 50, p. 9.  That holding is incontrovertible.  Indeed, the CBA's sweeping management rights clause—which explicitly states that Spirit retains its preexisting right to "transfer operations or part of operations"—is sufficient in and of itself to satisfy Spirit's light burden under *Conrail* and its progeny.

The management rights clause is found in Section 18 of the CBA, and reads in its entirety as follows:

> *Except as restricted by an express provision of this Agreement, the Company shall retain all rights to manage and operate its business and workforce, including but not limited to* the right to sell or discontinue all or part of the business; to sell or lease aircraft or facilities; to determine where and when to operate scheduled or unscheduled flights; to determine its marketing methods and strategies and to enter into code sharing, affiliation or marketing agreements with other carriers; to invest (including equity investments) in other business entitles including, without limitation, other air carriers; to determine the type of aircraft it will utilize; to increase and decrease its work force; to establish procedures; to determine qualifications for employment and promotions; to establish rules of conduct; to determine work schedules; to determine the means of providing passenger service; to determine size and composition of the workforce; to determine what equipment will be used; and **to** *transfer operations or part of operations.*

Doc. 10-1, § 18.A. (emphasis added).

The emphasized language, on its face, reserves to Spirit the right to transfer part of its dispatch operations to a second facility—a right Spirit unquestionably had before its FDOs unionized—unless PAFCA negotiated an "express provision" restricting that right. In its amended complaint, PAFCA based its major dispute argument on the meaning of "operations" in Section 18.A., arguing that it referred to Spirit's "passenger flight operations," not the "operational control work" performed by the FDOs. Doc. 10, ¶ 20. At best, this reading of Section 18.A. establishes that resolution of PAFCA's claims turns on the interpretation of that provision, and thus is a minor dispute.

Realizing this, PAFCA abandoned that argument in its opposition to Spirit's motion to dismiss, and before this Court. It has switched focus to a different part of Section 18.A.: the scope of the rights "retained" by Spirit. *See* Doc. 21, pp. 14-15; Doc. 50, p. 15 ("PAFCA focuses on two words in section 18A of the CBA—'[e]xcept' and 'retain'").[16] As discussed in Section III., *infra*, this latest approach, which relies on an unsupportable reading of the CBA and case law, fares no better on its merits and, in

---

[16]PAFCA argued to the district court that Spirit's decision to open a second OCC was "excepted" by an "express provision" of the CBA: Section 16, which relates to the temporary relocation of the OCC as a result of hurricanes. Doc. 21, p. 15. The district court held this did not render Spirit's interpretation frivolous or obviously insubstantial because Section 16 does not address a "*permanent* solution for solving weather disruptions," "says *nothing at all* about a permanent relocation," and did not establish "the exclusive method for keeping operations up and running in the event of a storm." Doc. 50 at 16 (emphasis in original). PAFCA dropped that argument on appeal.

any event, confirms that the dispute is over the meaning and interpretation of Section

18.A., and thus a classic minor dispute.

> **B.** **Other CBA Provisions Likewise Support The Conclusion That The Dispute Is Minor.**

The management rights clause, standing alone, is sufficient to establish that Spirit

has a non-frivolous basis to argue that the CBA permits it to open a second OCC.  But,

as the district court noted, "there's (much) more" to support Spirit's position.  Doc. 50,

p. 9.  For example, Section 6.D., states that when Spirit "*opts* to relocate" its dispatch

office, it must meet with PAFCA to discuss and agree on moving expenses for the

"*affected*" FDOs.  Doc. 10-1, § 6.D. (emphasis added).  The use of "opts" in this context

supports Spirit's position that the CBA makes it Spirit's decision—and its alone—to

relocate its operations if it sees fit.  As the district court pointed out, "nothing in the

CBA generally (or this provision specifically) suggests that Spirit cannot relocate only

*part* of its operations, as it has proposed to do here.  Doc. 50, p. 9. (emphasis in original).

Indeed, it is illogical to think that Spirit successfully negotiated the unilateral right to

decide to relocate its OCC in its entirety but not to take the lesser step of operating

multiple OCCs simultaneously.  Moreover, the requirement that the parties agree to

moving expenses for "affected" employees at least arguably implies that there could be

employees "unaffected" by the relocation, which would be the case if only a portion of

the operation was relocated.  *Id.* at 9.  Likewise, the CBA states that "orders" regarding

employee "transfers" and "relocation" must be in writing, further supporting Spirit's

position that it has the unilateral right to decide whether to relocate some or all of its operations and transfer employees to a second OCC.  Doc. 10-1, § 20.B.

To be sure, PAFCA disagrees with these interpretations and the district court's reliance on them. [17]  For instance, it argues that "transfers" in the CBA "is used exclusively to refer to transfers of an employee from one employment title to another." Brief, p. 27 n. 3.  PAFCA does not cite anything in support of this assertion, and it flies in the face of the management rights clause, which clearly refers to the transfer of operations as well.  Doc. 10-1, § 18.A.

PAFCA also claims that the reference to relocation of "the" dispatch office in Section 6.D. precludes the possibility of Spirit operating multiple OCCs.  Brief, pp. 26-27.  That argument (again) fails to account for the language specifically giving Spirit the right to transfer "part" of its operations.  Moreover, PAFCA ignores that Section 6.D. only relates to Spirit's obligation to negotiate with PAFCA over one of the *effects* of relocation (moving expenses), and not over the *decision* to relocate, which PAFCA admits remains in Spirit's discretion.  Brief, p. 27.  Thus, even if this section means that Spirit was only obligated to negotiate moving expenses when it relocates the dispatch

---

[17] PAFCA asserts that the district court erroneously made "findings" about what the CBA language means in concluding that the dispute is minor.  Brief, pp. 1, 24.  The court did no such thing.  On the contrary, it noted that it was *not* reaching any conclusions regarding whether PAFCA's interpretations of the CBA might prevail in arbitration.  Doc. 50, pp. 10, 19.  The court simply did what it was required to do under *Conrail*: analyze the CBA language to see if it arguably justified Spirit's position and thus satisfied the low bar for finding a dispute minor.

office in its entirety, that (at least arguably) would have no bearing on whether Spirit had the right to open a second OCC in lieu of a full relocation—just that it would not have any contractual obligation to negotiate moving expenses in that scenario.

In any event, PAFCA's arguments further prove Spirit's point:  that the dispute over Spirit's right to open a second OCC turns on competing interpretations of the CBA.  Once the Court reaches that conclusion and determines that Spirit's position is not frivolous or obviously insubstantial, it must find the dispute minor, without considering the merits of the dispute.  *See*, *e.g.*, *CSX Transp.*, 327 F.3d at 1320.  *See also BMWE v. Atchison, T. & S.F. Ry.*, 138 F.3d 635, 643 (7th Cir. 1997) (for union to prevail on argument that dispute is major, "the evidence must do more than tilt; it must slide into a heap on one side").

## III.   PAFCA'S REMAINING ARGUMENTS LIKEWISE CONFIRM THAT THE PARTIES' DISPUTE TURNS ON INTERPRETATION OF THE CBA, AND THUS IS A MINOR DISPUTE.

The combination of *Conrail* and the CBA provisions—especially Section 18.A., the management rights clause—is devasting to PAFCA's "major dispute" contention.  Thus, PAFCA resorts to arguing that Section 18.A. doesn't mean what it says, relying on a tortured reading of case law and the CBA.  PAFCA is wrong, but that is beside the point for this Court's purposes.  What is relevant is that PAFCA's arguments demonstrate that the dispute turns on competing interpretations of the CBA.  When, as here, the dispute concerns what the CBA means, and the employer's interpretation

of it is at least arguably justified, the dispute is minor, the court lacks jurisdiction, and its role is done.

### A.  PAFCA and Spirit Have Competing Interpretations Of The Scope Of The Rights Retained By Spirit In Section 18.A.

Section 18.A. plainly states that, except as "restricted by an express provision" of the CBA, Spirit "retain[s] all rights to manage and operate its business and workforce." What follows that general statement is a lengthy list of examples of the retained rights, which includes many relating directly to the working conditions of the employees—*e.g.,* establishing procedures, determining employee qualifications, enacting rules of conduct, determining work schedules, determining the size of the work force, and deciding the locations at which employees perform work. Doc. 10-1, § 18.A. This language was part of the prior CBA that Spirit had entered into with the union that represented its FDOs before PAFCA did, and PAFCA did not negotiate any changes to it. Doc. 12-1, ¶ 12.

Spirit, as did the district court, interprets Section 18.A. in a straightforward manner: as reserving to it all of the rights that it had to manage and operate its business and workforce prior to the unionization of the FDOs, except as expressly restricted by the CBA  After all, that is the point of management rights clauses: they confirm contractually that employers retain the rights that they previously had, before the employees unionized, which the union does not restrict or limit through the negotiation

process. *See* Section I.C., *supra*. Spirit's rights prior to the FDOs' unionization certainly included the right to transfer part of its operations to a second OCC.

PAFCA interprets Section 18.A. differently. Spirit, it says, didn't *really* retain all of the rights listed therein, despite what Section 18.A. plainly states. Instead of acknowledging that the rights Spirit retained were those it had *prior* to (or absent) unionization of the FDOs, PAFCA interprets Section 18.A. through the lens of what it believes Spirit's rights were *after* the FDOs unionized. Specifically, PAFCA argues that RLA employers (unlike their NLRA counterparts) do not retain the right after unionization to unilaterally change employee working conditions when the CBA does not expressly prohibit them from doing so. Brief, p. 9. From this (incorrect) premise, PAFCA contends that Spirit could not "retain" any of the rights listed in Section 18.A. that relate to working conditions, because it had no such rights in the first place. *Id.* at 25. The only "rights" that Spirit "retained" in Section 18.A., PAFCA concludes, are those constituting managerial prerogatives—over which Spirit had no obligation to bargain as a matter of law. *Id.* at 11-12, 17. PAFCA cites no authority interpreting management rights clauses in this novel fashion.

PAFCA further argues that the other potential source for the "rights" that Spirit arguably "retained" in Section 18.A. is a "specific contractual provision." Brief, pp. 25-26. That interpretation directly conflicts with the plain language of Section 18.A. and would turn the management rights clause on its head. Specifically, Section 18.A. states that Spirit retains all rights to manage it operations and workforce "[e]xcept as *restricted*

35

*by an express provision* of this Agreement." Doc. 10-1, § 18.A. (emphasis added). Thus. Spirit need not point to a "specific" contractual provision reserving to it the rights covered by Section 18.A.; PAFCA must identify an "express provision" restricting those rights.

At best, PAFCA has offered a creative interpretation of management rights clauses generally and Section 18.A. in particular. At worst, it concocted its interpretation out of whole cloth in an effort to avoid the impact of *Conrail* on its case. In either event, it is just that: an interpretation, and one with which Spirit disagrees. Doc. 12-1, ¶ 10.

Spirit contends that Section 18.A. means what it says, and thus Spirit retained all of the rights listed therein, working conditions and management prerogatives alike, unless restricted by express provisions of the CBA. PAFCA believes Section 18.A. is limited to management prerogatives and rights specifically set forth elsewhere in the CBA, and thus the references to working conditions are a legal nullity. Even if PAFCA's theory were plausible, it is not so overwhelmingly compelling to render Spirit's contrary interpretation frivolous or obviously insubstantial as required under *Conrail* and its progeny. Nor has PAFCA even suggested that this interpretation of Section 18.A. was contemplated by, discussed between, or agreed to by Spirit and PAFCA, or by Spirit and the FDOs' predecessor representative, which negotiated this language, as it must in order to show that Spirit's interpretation is not arguably justified. Doc. 12-1, ¶ 12.

36

In sum, regardless of the merits of PAFCA's theory, the dispute is minor, and the district court correctly dismissed for lack of subject matter jurisdiction.

**B.    PAFCA Wrongly Accuses The District Court Of Creating New Law In Finding The Concept Of Retained Rights Applicable In The RLA Context.**

The starting point for PAFCA's argument regarding the scope of Section 18.A. is its assertion that the district court created new law by allegedly engrafting NLRA "retained rights" jurisprudence to this RLA case. *See* Brief, p. 1 (identifying as statement of issue whether the district court erred in looking to NLRA precedent in holding that RLA employers have a legally-retained management right to unilaterally change working conditions if the CBA does not expressly prohibit it from doing so, which PAFCA asserts is contrary to Supreme Court RLA precedent). That misrepresents what the court did.

*First*, NLRA precedent was not the "sole source" of the district court's retained rights holding as PAFCA claims. Brief, p. 13. On the contrary, although the district court properly cited to the Supreme Court's *Warrior & Gulf* decision as establishing that management retains discretion to exercise rights unless the CBA restricts them from doing so, the court did not rely exclusively on NLRA precedent for this proposition. On the contrary, the court quoted extensively from *ABX II*—an RLA decision—that because CBAs "cannot expressly regulate every conceivable employment matter," they "need not include provisions permitting management action on every conceivable

37

employer matter, rather, on issues not discussed in the Agreement, management retains discretion." *ABX II*, 400 F.3d at 415-16 (quoted in Doc. 50, p. 17).[18]

To be sure, the *ABX* decisions cite NLRA case law (including *Warrior & Gulf*) in discussing retained rights, but that does not transform them into NLRA precedent. It is entirely proper for courts to rely in the RLA context on observations the Supreme Court made in NLRA cases about the nature of CBAs and the collective bargaining process, and the flexibility with which courts should interpret CBAs. Indeed, there are many RLA decisions—including *Conrail*—that relied on *Warrior & Gulf* and other NLRA decisions in this vein. *See Conrail*, 491 U.S. at 308-09 (relying on analysis of management rights clauses in *American Nat'l Ins.* in concluding that employers may bargain for flexible treatment in CBAs; Court "find[s] no difference between the NLRA and RLA in this respect"); *id.* at 311-12 (relying on *Warrior & Gulf* regarding the nature of CBAs and how they should be interpreted, including that a CBA is a "generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate"). *See also BMWE Division/IBT v. Norfolk S. Ry. Co.*, 745 F.3d 808, 815 (7th Cir. 2014); *Bhd. of Locomotive Eng'rs and Trainmen v. UTU*, 700 F.3d 891, 899-900 (6th Cir. 2012); *Capraro v. United Parcel Service Co.*, 993 F.2d 328, 332 (3d Cir. 1993); *Nw. Airlines, Inc. v. ALPA*, 442

---

[18] There are two ABX decisions, decided by different panels of the Sixth Circuit, both of which support the "retained rights" proposition noted by the district court. PAFCA incorrectly states that the district court cited *ABX I* in this context rather than *ABX II*. *Compare* Brief, p. 13 *with* Order Granting Motion to Dismiss, Doc. 50, p. 17.

F.2d 251, 254 (8th Cir. 1971).  Tellingly, PAFCA cites no authority holding to the contrary [19]

*Second*, PAFCA misleadingly suggests that the district court broke new ground with its "retained rights" analysis, asserting that the "term 'retained rights' … was non-existent in RLA jurisprudence" prior to its decision.  Brief, p. 13.  That argument is too cute by half.  Although courts may not have often used the *term* "retained rights," they have recognized that *concept* for decades in the RLA context, including in the *ABX* decisions (which go back 20 years) and the Seventh Circuit's 1990 ruling in *Chicago & North Western Transp.  See* 908 F.2d at 153 ("what the agreements do not forbid, either explicitly or implicitly … the railroad is allowed to do as a matter of contract").  *See generally* cases at note 9, *supra*.

Arbitration decisions likewise confirm that this doctrine has a long history under the RLA (often referred to as "residual" or "reserved" rights rather than "retained" rights).  As noted in a 1994 decision, for example:

> The Board finds that in such matters as dealing' with transfers, demotions, promotions, or resignations, where the contract is in fact silent, management has "residual" or reserved rights. These do

---

[19] Although PAFCA cites to the dissenting opinion in *PL&E* to argue that courts should exercise "caution" in drawing parallels between the NLRA and RLA (Brief, p. 13 n. 2), it ignores that the majority did, in fact, apply NLRA precedent to the RLA case before it.  *PL&E*, 491 U.S. at 509.  The Supreme Court has done so in other contexts as well, including, as noted, in *Conrail* with respect to the issues before the Court in this case.  *See also Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383 (1969) ("The Court has in the past referred to the NLRA for assistance in construing the [RLA], and we do so again here.") (citations omitted).

> indeed still reside in the Carrier, not because. the parties agreed to
> specifically grant them to the Employer, but by the very nature of
> collective bargaining.

*BRC v. Atchison, T. & S. F. Ry. Co.*, PLB No. 5264, Award No. 1 (Arb. Goldstein, 1994),

Doc. 12-3, p. 44.  *See also BRS v. S. Ry.*, NRAB 3d Div., Award No. 23133 (Arb.

Scheinman, 1981), Doc. 12-2, p. 3 (finding for employer in dispute over duration of

work week; "Given the absence of any specific restriction, Carrier was free, under well

established labor relations principles, to implement the change back to the normal work

week.  The Organization's agreement was not required.  After all, it is axiomatic that

Carrier retains all managerial prerogatives not relinquished by the [CBA].").  Put simply,

PAFCA's claim that the concept of "retained rights" under the RLA is a foreign one

which the district court created out of whole cloth by relying on NLRA precedent is

flat-out wrong.

Finally, but perhaps most critically, PAFCA's discussion of what rights

employers do or do not retain *inherently* after employees unionize utterly ignores the

significance of the CBA's *explicit* management rights clause to this case.  Through that

provision, which was the result of collective bargaining, the parties in fact *agreed* on the

rights Spirit retained.  As a result, in order to determine whether this dispute is major

or minor, the Court need not concern itself with whether, under *Warrior & Gulf*, the

*ABX* decisions, and other case law, Spirit's inherent retention of rights would be

sufficient to arguably justify Spirit's position.  Instead, the Court can (and must) look

to the express CBA language addressing that topic—language which at least arguably justifies Spirit's position.

The discussion of management's inherent retention of the right to make changes arose in this case because PAFCA alleged that the CBA was "silent" regarding Spirit's ability to open a second OCC.  Doc. 10, ¶16.  Spirit responded that PAFCA's "contention is wrong and ignores the plain language of Section 18.A."  Doc. 12, p. 15. Nevertheless, Spirit addressed PAFCA's "silence" argument by discussing numerous decisions in which courts and arbitrators found disputes to be minor even when the CBA was silent regarding the carrier's right to take the challenged action and contained no express management rights clause.  *Id.* at. 15-17.  The district court acknowledged that these decisions supported Spirit's minor dispute argument.  Doc. 50, pp. 10-11 (discussing *AFA v. United*, 976 F.2d at 105, in which the Second Circuit found a dispute over the carrier's decision to open a new domicile to be minor in the absence of any provision limiting the carrier's ability to do so).[20]  However, the court noted, the case

---

[20] PAFCA argues that *AFA v. United* is distinguishable because the union there "acknowledged that there were contract provisions that on their face arguably justified the carrier's actions," and argued instead that the carrier had exercised those provisions in "bad faith."  Brief, pp. 22-23.  The union made no such concession; it argued that the carrier's action was *not* arguably justified.  It lost that argument because the CBA provisions were, "at best ambiguous," and the CBA lacked any provision limiting the carrier from taking the challenged action.  *AFA v. United,* 976 F.2d at 105.  The union's "bad faith" contention was a secondary argument which the Second Circuit rejected as well.  *Id.* at 105-06.  Moreover, PAFCA misses the point when it attempts to distinguish factually *AFA v. United* and other decisions finding disputes over work assignment changes to be minor.  Brief, pp. 21-24.  Spirit and the district court cited these cases to

41

before it "is even stronger—because our CBA has much more than mere silence: It's replete, as we've seen, with *express textual support* for Spirit's position". *Id.* at 11 (emphasis in original). PAFCA's extended discussion of inherent "retained rights" where the CBA is silent is part of its effort to direct the Court's attention away from the impact of the management rights clause on the major/minor dispute analysis.

### C.    Neither *Shore Line* Nor *Telegraphers* Establish A Rule Excluding The Existence Of Retained Rights Under The RLA.

After misrepresenting the extent to which the retention of management rights has been recognized under the RLA, PAFCA spends most of the rest of its brief arguing that *Shore Line* (as interpreted by *P&LE*) and, to a lesser extent, *Telegraphers* created a rule categorically excluding the existence of retained rights under the RLA. Brief, pp. 13-20. That is not what those cases held, and such an interpretation would be at odds with decades of precedent. *See* Section III.B., *supra*. Moreover, none of these cases involved a situation where, as here, the carrier claimed that it had already bargained over and obtained the right to make the change, further rendering that decision inapposite.

As discussed in Section I.D., *supra*, *Shore Line* dealt with the scope of the status quo obligation during a major dispute—specifically, the carrier's contention that the

---

contradict PAFCA's incorrect assertion below that minor disputes never involve changes to working conditions, and to show that disputes over changes to where employees are assigned to work can be minor disputes where, as here, the carrier has an arguably justified basis supporting its right to make that change. See Doc. 27, p. 2 (citing same cases to refute PAFCA assertion that minor disputes "do not involve a proposed change to working conditions," Doc. 21, p. 7).

status quo "consist[ed] only of the working conditions specifically covered in the parties' existing collective bargaining agreement." *Shore Line*, 396 U.S. at 143.  The Supreme Court disagreed with that view, and held that, under the facts present there, management could not unilaterally change a longstanding practice not codified in the CBA, but rather had to bargain with the union over that change.  *Id.* at 153.

Contrary to PAFCA's contention, *Shore Line* did *not* create a categorical rule precluding carriers from arguing that they have the right to make changes to working conditions absent a specific provision prohibiting it from doing so.  On the contrary, it acknowledged that "the mere fact that the collective agreement before us does not expressly prohibit outlying assignments would *not* have barred the railroad from ordering the assignments that gave rise to the present dispute" if, for example, the carrier's right to do so was an implied term of the CBA.  *Shore Line*, 396 U.S. at 153-54 (emphasis added).  As *Conrail* later held, the question of whether the CBA contained such an implied term would be a minor dispute.

PAFCA's reliance on *P&LE* to try to bolster its reading of *Shore Line* is misplaced.  Brief, pp. 18-19.  *P&LE* (which PAFCA did not even cite in its brief below) has no direct application here; it addressed only whether the carrier's decision to go out of business was a managerial prerogative, a question that is "beside the point" since Spirit has not made a managerial prerogative argument.  Doc. 50, p. 15.  Moreover, *P&LE* did not embrace *Shore Line*, as PAFCA suggests, but instead held that decision "extended the relevant language of [the status quo rules] to its outer limits," and limited

*Shore Line* to the specific facts present in that case, which involved what "had been the unquestioned practice for many years, and we considered it reasonable for employees to deem it sufficiently established that it would not be changed without bargaining." *P&LE*, 491 U.S. at 506. *See also Chicago & N.W. Transp.*, 908 F.2d at 152 (*Shore Line* was "rather roughly handled" in *P&LE*).[21]

Telegraphers, which PAFCA cites only in passing in this context, does not advance its cause either. Brief, p. 16. *Telegraphers* involved the carrier's contention that it was not obligated to bargain at all over a union proposal to prevent the abolishment of jobs, under the theory that it involved a matter of management prerogative. The Court disagreed with the carrier's position on that score. All that PAFCA has to say regarding *Telegraphers* and "retained rights" is that "the conditions were present for the Court to find the existence of a retained right" but it did not do so—and that the carrier did not make that argument to the Court. *Id.* That is hardly a basis from which to extrapolate a categorical rule excluding "retained rights" in all cases.

---

[21] PAFCA has not made such a "past practice" argument here, and the CBA would preclude it from doing so. *See* Doc. 10-1, § 18.C. ("any past practices established prior to the date of this Agreement shall not create any contractual or legal obligation to continue such practices following the effective date of this Agreement"). *See also id.,* § 18.B. ("The exercise of any right reserved herein to management in a particular manner or the non-exercise of such right shall not operate as a waiver of the Company's rights hereunder or preclude the Company from exercising the right in a different manner.").

The most significant distinction between these decisions and the present case, however, again concerns the management rights clause that the parties negotiated here. In *Shore Line*, the Court held that the carrier could not make a change to a practice that had become an implied term of the CBA without first bargaining about it with the union. *Shore Line*, 396 U.S. at 154; *see also P&LE*, 491 U.S. at 506, n. 15 (describing *Shore Line* as holding that employer could not make change "without any bargaining whatsoever"). If the parties *had* bargained over that issue, and the union had agreed that the carrier retained the right to make that change, there would have been no major dispute.

That is precisely what Spirit argues occurred here. The parties, through the management rights clause, *already* bargained over and reached agreement on Spirit's right to make unilateral changes, including the right to transfer part of its operations. PAFCA wrongly describes Spirit's argument as being based on the "absence of an explicit or implied provision in the bargaining agreement prohibiting it" from opening a second OCC. Brief, p. 19. Spirit is relying on the *presence* of an explicit provision permitting it to take that action—Section 18.A. And while the absence of an express prohibition on its ability to do so is relevant, that it because that is what the *CBA itself* states is determinative of the scope of Spirit's retained rights—that Spirit may exercise those rights "[e]xcept as restricted by an express provision of this Agreement." Doc. 10-1, § 18.A. Because Spirit has pointed to specific provisions which show that, at least arguably, the parties bargained over and agreed to Spirit's right to make the change at

issue here, *Shore Line*, *P&LE*, and *Telegraphers* are irrelevant even under PAFCA's reading of those decisions.

## **CONCLUSION**

For all of the reasons set forth herein, the Court should affirm the decision of the district court dismissing PAFCA's Amended Complaint for lack of jurisdiction.

Dated: September 6, 2022

Respectfully submitted,

*/s/ Douglas W. Hall*

Douglas W. Hall
JONES DAY
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-5432
dwhall@jonesday.com

Ten E. Stallings
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, FL 33131
(305) 714-9757
tstallings@jonesday.com

*Counsel for Appellee Spirit Airlines, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond.

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12, 827 words.

Dated:  September 6, 2022

_/s/ Douglas W. Hall_
Douglas W. Hall
JONES DAY

_Counsel for Appellee_
_Spirit Airlines, Inc._

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2022, I electronically filed the foregoing Appellee's Answer Brief using the Court's Appellate ECF system, which will automatically send notification to counsel of record.

Dated:  September 6, 2022

> */s/ Ten E. Stallings*
> Ten E. Stallings
> Douglas W. Hall
> JONES DAY
>
> *Counsel for Appellee*
> *Spirit Airlines, Inc.*